**ESTEP v. UNITED STATES.**

**DELUKE v. SAME.**

**HENRY v. SAME.**

Nos. 2668, 2675, 2680.

Circuit Court of Appeals, Tenth Circuit.

Nov. 16, 1943.

D. M. Draper and H. L. Mulliner, both of Salt Lake City, Utah, for appellant Estep.

Ed C. Jensen, of Salt Lake City, Utah, for appellants Deluke and Henry.

Dan B. Shields, of Salt Lake City, Utah (John L. Geraghty, of Denver, Colo., on the brief), for appellee.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

Patrick T. Henry, Louis C. Deluke, and William Estep appeal from convictions and sentences on various counts of an indictment containing twenty-two counts. The first eleven counts charged appellants and others with violations of the mail fraud statute (Sec. 215, Criminal Code, 18 U.S. C.A. § 338); the next ten counts charged appellants and others with violations of the Securities Act of 1933, 48 Stat. 74, 15 U.S. C.A. 77q, and the twenty-second count charged the same parties with conspiracy to violate both the mail fraud and the Securities Act. Section 37, Criminal Code, 18 U.S.C.A. § 88.

The appellants Henry and Deluke were convicted by a jury verdict on counts one to nine, inclusive, and eleven and twelve. Appellant Estep was convicted by a jury verdict on counts three to eight, inclusive, and twenty-two. The appellants were ac-

quitted on all other counts of the indictment, either by verdict of the jury, or by direction of the court, and other defendants named in the indictment were acquitted on all counts by direction of the court. Thus, only the mail fraud and conspiracy counts are here on appeal. Henry and Estep were sentenced to a term of eighteen months on each count, and Deluke was sentenced to a term of two years on each count, said sentences to run concurrently. The appeal is here on a common record, and appellants Henry and Deluke have submitted their cause by a joint brief, while appellant Estep has a separate brief in his behalf.

The first count in the indictment is long and detailed, but in substance it charged the appellants and others with having devised a scheme to defraud, and with obtaining money and property by means of false and fraudulent pretenses from certain named persons, by and through the sale of stock in five separate mining corporations, which appellant Henry organized, and to which he transferred certain mining claims owned by him, and located near Marysvale, Utah. As salesman for the stock of the various corporations, appellant Deluke is charged with having falsely represented to fellow members of his church, known as the National Church of Positive Christianity, that the mining claims owned by the various corporations were highly mineralized with gold and silver, and other valuable minerals, assaying as high as $5,000 per ton; that in a short time the mines would be producing and marketing high grade ore with tremendous profits to the investors; and that Henry did not need funds with which to operate the mines, but because his wife had been cured by the teachings of the Church, he wanted to aid the Church and its members. Accordingly, Deluke represented that if the members of the Church would invest in the venture, and donate 25% of the stock purchased to the Church, everyone would reap bountiful returns, and the Church would prosper and grow; that members of the church and other prospective investors were induced to visit the mining properties in Utah, for the purpose of inspecting the same, and while there, appellants Henry and Deluke made representations to the inexperienced that certain veins in the mines contained valuable gold and silver ore, and in order to further deceive the prospective investors, it is alleged that Deluke altered and substituted certain assay reports of samples taken from the mining properties. According to the indictment, appellant Estep, who was founder and leader of the National Church of Positive Christianity, actively and affirmatively assisted Deluke in the sale of the mining stock to the members of the Church, by introducing him to his Church school classes, and by otherwise encouraging the members to invest in the mining stock.

By this means, it is alleged that the appellant induced members of the National Church of Positive Christianity and others to invest large sums of money in the mining venture, with knowledge that the said properties were not highly mineralized; and that they were not productive of large quantities of valuable ore containing silver, gold, and other valuable minerals as represented. Each of the mail fraud counts, after incorporating by reference all of the allegations of the first, alleged a separate use of the United States mails in the execution of the alleged scheme. In conventional form, count twenty-two charged appellants and others with having formed a conspiracy to violate the mail fraud statute as alleged in the first count, and the Securities Act. Ten overt acts were charged in furtherance of the conspiracy.

The appellants challenge the sufficiency of the evidence to support the verdict of the jury on any count of the indictment, and our examination of the record evidence reveals the following pertinent facts. Appellant Henry was interested in certain mining claims near Marysvale, Utah, most of which had been previously explored and worked without profitable results. In 1938 and 1939, Henry organized five separate corporations known as the Rainbo Gold Mines Corporation, Valdasia Gold Mines Corporation, Trinity Gold Mines Corporation, Patrick T. Henry Development Corporation, and Carisa Gold Mines Corporation. Each of the corporations was capitalized for one million shares of stock, with a par value of $1. As president and managing officer of each of the corporations, Henry from time to time caused to be transferred to the corporations the mining claims which he either owned or acquired by purchase in the name of the corporation. He resided at Marysvale, where he supervised whatever mining operations were conducted on the properties. Early in 1938, he made arrangements with the brokerage firm of Maloney and McDaniel, in Wilmington, Delaware, for the sale of

stock in the Rainbo Corporation. Through McDaniel, Deluke became a salesman for the mining stock, for which he received a commission of 20% in cash, and 20% bonus payable in stock. Deluke was a resident of Wilmington, Delaware, and was a member of the Washington branch of the National Church of Positive Christianity. He solicited and sold stock of the Rainbo Corporation to members of his church in Washington, by representing to them that the mining properties owned by the Rainbo Corporation contained great quantities of high grade ore, which, when fully developed and in operation, would yield enormous profits to the investors. He induced the members to donate 20% of the stock purchased to the Church, with the understanding that the profits derived from the investments would not only enrich themselves, but would greatly aid the cause of the Church.

Deluke met Henry in Wilmington early in 1939; they discussed the mining properties, and soon thereafter Deluke visited the properties near Marysvale. He inspected and generally familiarized himself with the conditions there, obtaining his information from Henry and others who were in charge of the mining properties. As a result of this meeting, arrangements were made whereby Deluke agreed to sell the stock, first of the Rainbo Corporation, and later of the other corporations as they were formed, and Deluke's contacts thereafter were directly with Henry. Early in October 1939, Deluke traveled to the mines in Utah in an automobile with a prospective investor named Vattilana. Samples of ore were taken, and left with an assayer in Salt Lake City with directions to mail the reports to Deluke in Wilmington. Vattilana was apparently enthusiastic about the mining venture, and was anxious to learn the result of the assay. Deluke became apprehensive concerning the assay reports, and while enroute, he called his niece by telephone, instructing her to "steam" open the envelope containing the assay reports. Upon arrival in Wilmington, Deluke removed the unfavorable parts of the assay reports, and altered some of the remaining ones, resealed the envelope and took it to the home of Vattilana where it was opened in his presence, leaving the impression that he had not previously seen the report. When Vattilana did not purchase any of the stock, Deluke wrote to Henry in part as follows, "Words cannot express my disappointment about Vattilana, his associates, and his slick lawyer. I did my best, but the cards were really stacked."

In November 1939, Deluke went to Chicago where he met his old friend, Estep, who was the founder and leader of the National Church of Positive Christianity, and at that time was conducting a course of lectures in the Chicago branch of the Church. After Deluke explained his proposition, Estep introduced him to his classes as his old friend and theological student, who had a proposition which might be of interest to the members of the Church. Whereupon, some of the members of the class met with Deluke in another room after adjournment, and Deluke gave them a vivid and colorful account of the history of the mining properties. He freely predicted that the mines would soon be producing valuable ore, and would yield enormous profits to the investors within a short period of time. As in Washington, D. C., he urged the plan of having the investors donate 25% of the stock purchased to Estep, as trustee for the Church, the profits of which were to inure to the benefit of the Church. Soon after he came to Chicago, two women who were members of the church made a trip to Utah with Deluke for the purpose of inspecting the properties, and making a report to the Church membership. From what these women saw and were told by Henry and Deluke, they became highly enthusiastic over the venture; they permitted Deluke to sign their names to a telegram addressed to Estep in which they expressed their favorable impression of the mining properties, and their intention to purchase more stock, and Estep showed this telegram to members of the Church. Upon their return to Chicago from the mines, another meeting was held in which glowing pictures were painted of the mining properties by the women, and many of the members purchased stock either for the first time, or increased the purchases they had already made.[1]

In February 1940, Deluke journeyed to

---

[1] As a result of the story the two women told, a Mr. Ball wrote to Henry in part as follows: "From her story, I visioned a colossal nugget of gold resting on twelve hundred acres of ground with its magestic peak towering upward in the glory of mountain beauty. It was then that I started to digging, but my pockets were almost empty. * * *"

Milwaukee where he again contacted appellant Estep, who had preceded him there, and who was conducting lectures to his church membership. Estep again introduced Deluke to his classes as an old friend with an attractive proposition to present. Deluke followed the same sales tactics in Milwaukee as in Washington and Chicago, and with somewhat the same results. He sold stock to the members of the Church, and induced the investors and prospective investors to visit the mines, where they inspected them under the guidance and supervision of Henry and Deluke. Estep was also urged to, and did visit the mines early in June 1940 in company with other members of the Church. On this inspection tour, samples of ore were taken, and moving pictures were made of different mining properties. As a result of this trip, a number of members of the Church, including the wife of appellant Estep, were influenced to buy stock and to increase their holdings in the various corporations. The members of the Church were led to believe that the mining stock was offered exclusively to them, and they were admonished by Deluke not to reveal the plans to anyone.

During all this time, Henry and Deluke were in constant contact by means of letters, telephone, telegraph, and personal conferences. From time to time, Deluke made suggestions to Henry concerning the contents of letters which Henry would write to Deluke, and which were used by Deluke to fortify his representations concerning his operations at the mines, and the prospects for early profits. The correspondence between Henry and Deluke indicates that it was a part of the sales psychology to create the impression that Henry did not need the money with which to develop and operate the mines, but that he was generously manifesting his appreciation and interest in the Church and its teachings which had greatly aided his wife's health. From the correspondence, it is also clear that Deluke and Henry were apprehensive of the regulatory authorities in Illinois, and other states where the stock was offered for sale, as well as the Better Business Bureau and the Securities Exchange Commission, and that they sought to avoid the scrutiny of any regulatory agency. This apparently prompted the admonition of secrecy among the members of the Church concerning the entire venture. A competent mining geologist testified that the mining operations did not develop any ore capable of commercial or profitable mining, and extensive tests did not offer any favorable prospects for a profitable mining enterprise.

From these facts, the jury by its verdict concluded that the appellants devised a fraudulent scheme, and used the mails in the execution thereof. It also found that the appellants had formed a conspiracy to devise the fraudulent scheme, and that overt acts had been committed in furtherance thereof.

The appellants Henry and Deluke do not deny the substance of these representations and promises as charged, but rather assert that they were made in good faith, with the honest belief that they were true, and upon a trial of the case, they reasserted their faith in the potentialities of the mining properties, contending that further development of the mines would result in a profitable mining venture. They now point to the undisputed fact that the money obtained by the sale of the stock (with exception of commissions to Deluke) was used in the development and operation of the mines; and that the mines were operated efficiently and economically, and for the best interests of the investors. In other words, they interposed the defense of good faith and honest belief in the representations and promises made.

Appellant Estep denies that there was a fraudulent scheme or conspiracy, but if so, he contends that he was never a party to it, or a conscious participator therein. He contends that his interest was solely for the welfare of his Church and its membership, and whatever he did to encourage the sale of the stock was prompted by the conviction that the Church and its members would be benefited thereby.

■ If the dominant purpose and object of the enterprise was to engage in legitimate mining operations, and the sale of the mining stock was purely subordinate to that end, such purposes lend themselves to legitimacy, and tend to deny criminal intent. But no amount of self-delusion will justify an otherwise baseless representation to others, and if there is competent evidence in the record from which the jury is justified in concluding that the representations made were tainted with a fraudulent intent, its verdict will not be disturbed. Hawley v. United States, 10 Cir., 133 F.2d 966. Although the evidence is conflicting in respect to some material items, we think it is amply sufficient to support the verdict of the jury on the vital question whether

the appellants Henry and Deluke devised a fraudulent scheme to obtain money and property by means of false and fraudulent pretenses, and that they use the mails in the execution thereof. Furthermore, we conclude that the evidence was entirely sufficient to justify the conclusion of the jury that Henry and Deluke conspired to devise the scheme to defraud, and that one or more overt acts were committed in furtherance of the said conspiracy.

■ The case against the appellant Estep requires separate consideration. There is no evidence reasonably tending to show that Estep originally devised a scheme to defraud, or formed the conspiracy. It is contended however by the Government that he knowingly aided and assisted in the execution of the fraudulent scheme, and that he joined and adopted the conspiracy, and thereafter consciously participated therein by affirmative acts, from which the jury was justified in holding him criminally responsible. Of course guilty knowledge or criminal intent is usually a factual question, peculiarly within the province of the jury, and is seldom provable by direct evidence, but must be inferred from facts and circumstances which reasonably tend to manifest a mental attitude. Gates v. United States, 10 Cir., 122 F.2d 571, 575; Aiken v. United States, 4 Cir., 108 F.2d 182; Shell v. State, 184 Ark. 248, 42 S.W.2d 19. "If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent." Ellis v. United States, 206 U.S. 246, 257, 27 S.Ct. 600, 602, 51 L.Ed. 1047, 11 Ann.Cas. 589. But, "Without the knowledge, the intent cannot exist. * * * Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal." Direct Sales Co., Inc., v. United States, 319 U.S. 703, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674, decided June 14, 1943. See also United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128. Often the line between honest belief and purposeful misrepresentation is fine and indistinct, between the two however lies guilt or innocence, and where the evidence is evenly balanced between guilt and innocence, a conviction cannot stand.

■ It is true that there was evidence that Estep introduced Deluke to the members of his Church as a man who had a dream about a mountain of gold, and that he urged them to buy the stock of the various corporations; it is also true that Estep's intense interest in the venture greatly influenced the members of his Church to purchase the stock. Indeed, Estep was not only the medium by which Deluke contacted the members of the Church, but more important, he was the moral force by which Deluke was able to gain the confidence of those to whom he sold the mining stock. In other words, there can be no doubt that the appellant Estep was instrumental in the effectuation of a scheme, which the jury has found to be criminally fraudulent. But, there is no direct proof tending to show that Estep profited, or hoped to profit, from the sale of the stock, except as it might benefit the Church of which he was the founder and leader. Furthermore, there is nothing in the record to indicate that Estep's interest was not directed solely to the welfare of his Church and its members. He was subjected to the same sales psychology as the other members of his Church, and his resistance was no greater. The testimony and correspondence of Henry and Deluke clearly indicate that they did not at any time take Estep into their confidence, but rather it affirmatively shows that they intended to treat him as other members of the Church. From the evidence, it is as reasonable to conclude that Estep was victimized by Henry and Deluke, as that he was a conscious participator in the fraudulent scheme or the conspiracy. We conclude that the verdict of the jury as to Estep is not supported by that degree of proof which we deem essential to a finding of guilty knowledge and criminal intent, and accordingly the judgment is reversed as to him.

■ The appellants raise the question of the admissibility and the competency of much of the evidence on which the verdict of the jury is predicated. They contend that the court erroneously admitted documentary evidence, including third party letters, and other letters, which were never properly identified as competent evidence in the case. At the commencement of the trial, the government offered, and the court admitted en masse, 112 exhibits, and at that time, their competency was challenged on the ground that they had not been properly identified. The court observed that any written instrument admitted in evidence, and not later shown to be competent, would be stricken on motion of any party; he admonished counsel to keep a memorandum of all communications, and to call his attention to the failure of the government to establish

the competency of any one of them. In the process of the trial, other exhibits were admitted under similar rulings of the court. At the conclusion of all the evidence, counsel for appellants moved to strike certain enumerated exhibits on the grounds of their incompetency to prove any issue in the case. Appellants Henry and Deluke freely admitted having either written and mailed, or recieved through the mails, most of the exhibits included in the motion to strike, and some of them were third party letters which tended to incriminate certain defendants who were peremptorily acquitted. At the conclusion of the court's instructions, counsel for appellant called the court's attention to the letters which had not been identified, or which had not been written or received by the appellants, and requested the court to instruct the jury that the facts stated in the letters were not " * * * binding upon any of these defendants unless it was proved upon the stand that those things did take place as stated in the letters." In response to this request, the court stated, "That is true of course * * *", and referring to one of the letters complained of, the court stated, "the case must be proved as against these defendants, and the false representations made by any of them must be by sworn testimony on the witness stand, or inferred or proved directly by letters, written by themselves or himself, and that is true of all these third party letters." There were of course some letters and correspondence admitted in the case to which none of the appellants was a party, and they were clearly inadmissible. But, when this evidence was called to the attention of the court, the jury was admonished not to consider it in the determination of the guilt or innocence of these appellants. From the whole record, we are unable to say that the court committed prejudicial error in the admission of this evidence.

■■■■ Appellants also complain of the conduct of counsel for the government which, they contend, prevented them from having a fair and impartial trial. It is true that many questions propounded by the district attorney were subject to valid objection, and that many side remarks and statements made by him were inappropriate, and certainly not commendable, but no objections were made or exceptions taken to many of the statements and questions at the time they were made. Misconduct of government counsel in the form of improper remarks made in the course of the trial, and in the presence of the jury, which is shown to have prevented the defendant from having a fair and impartial trial, is subject to review whether formal objections are made or not; and government counsel should at all times scrupulously refrain from overstepping the bounds of propriety and fairness, which should characterize the conduct of a representative of the sovereignty. Viereck v. United States, 318 U.S. 236, 248, 63 S.Ct. 561, 87 L.Ed. 734; Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314; New York Cent. R. Co. v. Johnson, 279 U.S. 310, 49 S.Ct. 300, 73 L.Ed. 706; Pietch v. United States, 10 Cir., 110 F.2d 817, 129 A.L.R. 563; Metropolitan Life Ins. Co. v. Banion, 10 Cir., 106 F.2d 561. But we do not think that the remarks and statements, when viewed in their proper relationship to the whole trial, amounted to a miscarriage of justice, or prevented the appellants from having a fair and impartial trial.

■■■■ Finally, the appellants contend that the trial cour' committed reversible error in its instructions. Particularly it is argued that the court erroneously defined the word "defraud" in the following language: "to defraud a person of his money or property means to deprive him of it * * * without giving any fair consideration." At the conclusion of the court's instructions, the court invited counsel to make suggestions, and to make their record. Thereupon, an extended colloquy occurred between the court and counsel, in which counsel made a number of suggestions to the court concerning the instructions, which the court accepted and "incorporated in the language of counsel." At the conclusion of the colloquy, counsel for appellants took exception to a part of the instructions, but they did not suggest that the court had not accurately defined the word "defraud", nor did they object or except to the definition given. It may be that the court's definition of the word "defraud" in its statutory sense was inaccurate and subject to a valid objection, but no objection was taken, and we are not convinced that it was so palpably inaccurate and misleading as to be fatal to the rights of the accused, or to deprive them of a fair and impartial trial. See Forakis v. United States, 10 Cir., 137 F.2d 581.

The judgment is affirmed as to Henry and Deluke, and reversed as to Estep.