**Gilbert D. JACOBS, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 18118.**

United States Court of Appeals
Eighth Circuit.

May 5, 1966.

John C. Stevens, Muscatine, Iowa, for appellant.

Donald E. O'Brien, U. S. Atty., Sioux City, Iowa, Richard J. Vipond and Charles W. Ehrhardt, Asst. U. S. Atty., Sioux City, Iowa, for appellee.

Before VOGEL, Chief Judge, BLACK-MUN, Circuit Judge, and STEPHEN-SON, District Judge.

BLACKMUN, Circuit Judge.

In an indictment of eight counts Gilbert D. Jacobs was charged with violation of 15 U.S.C. § 714m(a),[1] in that he made statements, which he knew to be false, for the purpose of influencing the action of the Commodity Credit Corporation, or of obtaining for himself a thing of value under §§ 714–714o. After a plea of not guilty he was tried and convicted by a jury on all eight counts. The usual motions for judgment of acquittal were denied. The defendant received two years on each count, these sentences all to be served concurrently, and, in addition, was fined $500 on each of the last three counts. The execution of the prison sentences was suspended and the defendant was placed on probation for two years.

Defendant Jacobs is a bonded warehouseman operating grain storage facilities at Muscatine, Wilton Junction, and Durant, Iowa, under the name of Wilton Elevator Company. Commodity Credit Corporation (CCC) is a corporation cre-

1. 15 U.S.C. § 714m(a). "Whoever makes any statement knowing it to be false, * * * for the purpose of influencing in any way the action of the [Commodity Credit] Corporation, or for the purpose of obtaining for himself or another, money, property, or anything of value, under sections 714–714o * * * or under any other Act applicable to the Corporation, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment by not more than five years, or both."

ated by Act of Congress in 1948 as "an agency and instrumentality of the United States, within the Department of Agriculture" for "the purpose of stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities * * * and of facilitating the orderly distribution" of such commodities. 15 U.S.C. § 714. The Supreme Court has described it as "an administrative device established by Congress for the purpose of carrying out federal farm programs with public funds". Rainwater v. United States, 356 U.S. 590, 592, 78 S.Ct. 946, 948, 2 L.Ed. 2d 996 (1958).

One function of CCC is to extend farmers price support loans secured by agricultural commodities which then may be stored on the farmer's premises. 7 U.S.C. § 1441. Corn loans mature July 31 of the year following production. The farmer has the option to repay his loan in cash, or to continue the corn's storage on his farm, or to satisfy the loan by delivering the collateralized corn to CCC. When the market price is lower than the amount of the loan the last is the course usually pursued.

CCC makes contracts with private warehousemen for the storage of delivered crops and ordinarily permits the farmer to choose the warehouse to which he will make delivery. However, if storage space is not available in the farmer's trade area, he is directed to deliver either to a CCC bin site or to a private warehouse outside the trade area; in the latter case he is entitled to receive a transportation allowance.

Defendant Jacobs entered into written agreements with CCC for the storage of grain in his elevators at Durant and Wilton Junction, respectively. Each of these contracts is a CCC form entitled "Uniform Grain Storage Agreement". It recites that CCC desires that the warehouseman's facilities be made available for grain owned by or in the possession of CCC or of a farmer "as of the date of deposit in the warehouse". It provides that "All the grain accepted by the warehouseman shall be received, stored (if in storable condition) up to the capacity made available by him * * *"; that the term "receiving" means "Receiving and unloading all of the grain from cars * * * trucks * * * and elevating into, bulking, cutting in, or piling in the warehouse"; that, unless otherwise agreed in writing, "All the grain accepted by the warehouseman for storage shall be deemed to be commingled with other grain and the responsibility of the warehouseman with respect thereto shall be as if stored commingled"; that "In the case of grain stored commingled, the warehouseman at all times shall maintain in the warehouse indicated on the warehouse receipt(s) and in which the grain was originally deposited for storage a stock of grain of the quality, class and grade, and fairly representative of the quality which he is obligated to deliver against the warehouse receipt(s) representing grain stored subject to the terms of this agreement"; and that the period during which warehouse charges are payable by CCC "shall begin with the date each lot of the grain is deposited in the warehouse or the date storage charges begin as recorded on the warehouse receipt * * * whichever is later". A schedule attached to the agreement sets forth the rates at which CCC will pay the warehouseman for "receiving" (less for identity preserved than for commingling), "loading out", and "storing, insuring, conditioning, and all other charges". The receiving and loading out charges are expressed in cents per bushel and the others in thousandths of a cent per day.

The local CCC representative is the Agricultural Stabilization & Conservation Service (ASCS) Committee in the county. When a farmer wishes to turn in his corn the procedure usually begins with a transmission by the Committee to the farmer of a Commodity Delivery Notice (Form CCC Grain-50) in seven copies. Section 1 of this notice instructs the farmer "to deliver to the storage point indicated, by the date shown, the commodity described herein". Section 2 is

completed and executed by both the farmer and the warehouseman following delivery of the corn. In essence, it is a statement and certification of grade and quality but the warehouseman also certifies that he "will issue acceptable warehouse receipt(s) for the commodity accepted for local storage". The warehouseman then executes and issues a Warehouse Receipt for Bulk Grain which states that he "has received for storage" from CCC on the date "deposited" bulk grain of stated quality and quantity and that such grain "is stored in the warehouse of the above named warehouseman, located at * * *." When the warehouse receipt is delivered, the Committee executes Section 5 of the delivery notice certifying delivery and approval. The Committee retains a copy of the delivery notice and forwards two copies, together with the warehouse receipt, by mail to the ASCS area office at Evanston, Illinois. Evanston prepares and sends the warehouseman its "Invoice for Warehouse Charges" (Form CSS 641–3) setting forth its understanding as to the status of deliveries and amounts owed the warehouseman for storage and receiving charges. The warehouseman returns the invoice after correction and certification that "the services for which payment is claimed have been performed in conformity with the provisions of my storage warehousing agreement with the" CCC. The invoice is then processed for payment.

In 1962 Jacobs departed from this described procedure in one respect. It is this deviation which has led to his criminal prosecution.

At that time the market price of corn was under the support price which had governed the amount of corn loans. As a result many farmers chose to satisfy their loans by the release of their corn to CCC. This resulted in a shortage of available warehousing space in Muscatine. A number of farmers who had requested permission to deliver to Muscatine warehouses acquiesced in the suggestion that their corn be delivered, instead, to the defendant's facilities in Wilton Junction

and Durant. These points were approximately ten and fifteen miles, respectively, north and northeast of Muscatine.

The defendant, at the same time and on his own account, was purchasing corn from farmers and selling substantial amounts to McKee Feed & Grain Co. at Muscatine. His truckers, instead of taking the CCC corn to the Wilton Junction and Durant elevators, carried it directly from the farms to McKee. The defendant then issued CCC warehouse receipts on his Wilton Junction and Durant elevators.

Each count of the indictment is premised on a documentary exhibit by which the government claims that Jacobs falsely stated either that he received and placed in storage specific corn which in fact had been delivered to McKee without passing through the defendant's warehouse, or that he was entitled to compensation for having done so. The subjects of Counts I, II and III are warehouse receipts. Those of Counts IV and V are commodity delivery notices. Those of Counts VI, VII and VIII are invoices for warehouse charges.

The defense raises several issues. We pass immediately to the one we regard as the most important, namely, the sufficiency of the evidence to support the conviction.

Section 714m(a) obviously embraces a number of requirements: (1) There must be a statement; (2) it must be false; (3) the defendant must know it to be false; and (4) the defendant must make it either for the purpose of influencing action of CCC or for the purpose of obtaining a thing of value under an act applicable to CCC.

The statements here are those embraced in the eight count documents. We note that it is conceded that the corn which was covered by these CCC transactions was fungible. We also note that at all times Jacobs possessed free corn in his warehouses of sufficient quantity and quality to cover the CCC corn designated for delivery there, and that he was able to and did fulfill all his warehouse obli-

# 964

gations. The facts of such cases as Marteney v. United States, 218 F.2d 258, 262 (10 Cir. 1954), cert. denied 348 U.S. 953, 75 S.Ct. 442, 99 L.Ed. 745, therefore stand in contrast. Here no excess corn ever went into the grain market.

We further note that the count transactions did not cause CCC to incur any expense which it would not have incurred if the CCC corn had first been taken in at the defendant's warehouses and then had been immediately removed from those warehouses and delivered to McKee. Jacobs could have followed this roundabout course and, had he done so, would have encountered no difficulty. His direct trucking from the farm to McKee, however, was not only a shortcut but it could produce some savings for him. He would not have to haul the corn so far since the distance from the farm to Muscatine was shorter than the distance from the farm to the warehouse at Durant or Wilton Junction plus the distance back from the warehouse to Muscatine. Also, if CCC paid the defendant the receiving charge, he would receive compensation for work not performed on the specific CCC corn transported from the farm to McKee. That work, however, had been performed on other fungible corn in the warehouse available for delivery against the CCC transactions. The defendant, incidentally, received no transportation charge from CCC.

The government emphasizes the language of the storage agreement and the count documents which has been described above. It is true that these instruments speak, and naturally so, of CCC corn "deposited" and "accepted", "received" and "stored", and of receiving charges.

We recognize that on an appeal from a conviction the evidence is to be viewed in the light most favorable to the government. Vinyard v. United States, 335 F.2d 176, 178 (8 Cir. 1964), cert. denied 379 U.S. 930, 85 S.Ct. 327, 13 L.Ed.2d 342; Smith v. United States, 331 F.2d 265, 278 (8 Cir. 1964), cert. denied 379 U.S. 824, 85 S.Ct. 49, 13 L.Ed.2d 34.

Yet "Statutes creating crimes are to be strictly construed in favor of the accused * * * Before one may be punished, it must appear that his case is plainly within the statute; there are no constructive offenses". United States v. Resnick, 299 U.S. 207, 209–210, 57 S.Ct. 126, 127, 81 L.Ed. 127 (1936). This court has recognized this "principle of strict interpretation of statutes against the Government which generally prevails in criminal cases". Blumenfield v. United States, 306 F.2d 892, 901 (8 Cir. 1962).

The very storage agreement here clearly and specifically (1) contemplates commingling of all grain accepted unless "identity preserved" is called for in writing; (2) fixes the warehouseman's responsibility "as if stored commingled"; (3) requires the maintenance of a sufficient stock of fungible corn for delivery against the CCC receipts; (4) differentiates in its receiving and storing charges between commingled grain and that with identity preserved; and (5) contemplates the payment of "loading out" charges which obviously have valid application to replacement corn. Both the commodity delivery notice and the warehouse receipt are consistent in their representations with the storage agreement's recognition of fungibility even though one or the other or both refer to date of deposit, particular loan number, location of the warehouse, and the receiving of grain for storage. But each recital in these instruments also has effective and sensible application to replacement corn then in the warehouse so long as quality and quantity are satisfied, a condition which, as has been noted, was always fulfilled.

We are not convinced that there is anything in the storage agreement or in the first five count documents which constitutes an express representation that particular CCC corn was received in storage and we find nothing in any statute or regulation which imposes this requirement. There is no complaint by the government about storage charges on the replacement grain; it has been content to pay those charges. Deputy Director

Smith of the Evanston office testified that he could find no violation of any statute or regulation by the defendant. He did state that the transactions questioned here were against CCC "policy" but he authorized the filing of documents in his office with full knowledge of the nature of the transaction.

■ The prosecution has suggested no reason, and we have been unable to think of one, why a warehouseman operating under a contract for commingled storage should be required to receive specific corn when, concededly, he is under no obligation to keep that corn (so long as sufficient other stock is possessed) once he has received it. In the absence of a statute or contract which clearly imposes it, and when a criminal conviction hangs in the balance, we decline to manufacture such a requirement. We therefore conclude that the only reasonable interpretation of the storage agreement, the commodity delivery notices, and the warehouse receipts precludes the attribution of falsity to the notices and receipts. See Blumenfield v. United States, supra, and Carvahlo v. United States, 113 U.S.App. D.C. 253, 307 F.2d 394 (1962). The first five counts of the indictment therefore must fail.

A somewhat different situation may be presented with respect to the receiving charges and the CCC invoices which are the subject of the last three counts. On these the warehouseman certifies that he has verified the invoice and that "the services for which payment is claimed have been performed in conformity with the provisions of my storage warehousing agreement with the" CCC. And the agreement referred to defines "receiving" in part as "Receiving and unloading all of the grain from cars * * * trucks * * * and elevating into, bulking, cutting in, or piling in the warehouse". Even if the agreement is not to be construed as requiring the warehouseman thus to receive any specific corn—as we have so construed it—it might conceivably be regarded as providing that he must do so in order to become entitled to collect the receiving charge. If so, the defendant's certification of his charges for deliveries not taken into his warehouse would be false.

■ However, even assuming this, more than a false statement, as we have noted, is required to sustain a conviction under the statute. The requirement of knowledge must also be satisfied. If, when the defendant affixed his certification to the invoice, he reasonably believed that he was entitled to claim a receiving charge, this additional condition is not satisfied. This leads us to note certain other facts established by the record:

The local Committee was aware of the McKee deliveries. The defendant discussed the problems raised by those deliveries with Deputy Director Smith of the Evanston office in a telephone conversation on November 6, 1962. Smith told the defendant that it was contrary to CCC policy for a warehouseman to write receipts on a warehouse and deliver corn elsewhere and that the defendant could not claim receiving charges on such deliveries. It was agreed, however, that Smith would write the defendant a letter authorizing the issuance of warehouse receipts and the execution of delivery notices for such deliveries as had already been made. That letter was written the following day. It contained the authorization and said, "Since this corn was not actually delivered by the producers and taken into your elevators you will not be entitled to the receiving charges of 4¼¢ per bushel under the Uniform Grain Storage Agreement. This amount will be deducted from your invoices covering the receiving charges". On November 19 the defendant wrote Smith advising him of warehouse receipts which he had issued pursuant to this authorization. In this letter he also stated that he expected to be paid; that he was coming to Chicago [Evanston] to see Smith about this and other matters on November 27 and that "If your office is concerned about the 4¼¢ receiving for those W/Rs please send me a bill and I will send you my check and argue about it later". (This request was apparently motivated by the defendant's desire to obtain payment of

a substantial sum then due him from CCC which he felt had been withheld because of the dispute over the receiving charges.) The defendant testified that he did see Smith in Evanston on the 27th. Smith testified that he assumed that the defendant came at that time although he was unable to recall that such an interview had occurred. The defendant further testified with reference to this meeting that he and Smith were unable to agree whether or not he was entitled to payment of the receiving charges and that "it was decided that they wouldn't pay until they found out whether they should or not". After November 15 the defendant received a CCC invoice (not one of the count documents) in the mail. The receiving charges attributable to two McKee deliveries had been crossed out on this form pursuant to directions from Smith. The defendant on December 5 certified the invoice as so reduced and returned it. Later he received the three invoices upon which the last three counts of the indictment are founded. Each listed receiving charges for one or more of the McKee deliveries of all but one of which Smith had been informed but which now were *not* crossed out and deducted by Evanston. The defendant certified and returned these invoices in the belief, as he testified, that "they had decided to pay me for the receiving charges that we had been arguing about". In fact, the failure to omit the receiving charges in these documents was the result of an error in the Evanston office. It is perhaps true, as the government asserts, that Smith's actions may not bind the government or the CCC. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Yet we are concerned here not with contractual effect but with required criminal knowledge.

■ This condition of the record does not support a conclusion that the defendant knew when he certified the count invoices that he was not entitled to the receiving charges in question. The record clearly indicates instead that he, in good faith, held exactly the opposite

view; it even indicates that at the time of the certifications he had justification to believe that Evanston acquiesced in his position. The last three counts of the indictment, therefore, must also fall.

■ We realize that the defendant may have acted carelessly or even foolishly in his relations with CCC arising out of the McKee deliveries. Surely it would have been wiser for him not to certify the invoices until he had obtained explicit confirmation that CCC acquiesced in his position. But carelessness or lack of wisdom is not equivalent to the knowledge of falsity required by the statute. And mere violation of a CCC "policy" is not equivalent to a violation of § 714m (a).

This makes it unnecessary for us to consider the other issues, raised by the defense, relating to venue, the trial court's refusal to suppress evidence, entrapment, and the court's instructions.

Reversed with directions to enter judgment of acquittal on all counts.