**UNITED STATES of America,**
**Appellee,**
**v.**
**Robert V. STEINHILBER, Appellant.**
**No. 73–1056.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 11, 1973.

Decided Aug. 29, 1973.

Donald L. Mason, Kansas City, Mo., for appellant.

Anthony P. Nugent, Jr., Asst. U. S. Atty., Kansas City, Mo., for appellee.

Before GIBSON, LAY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

Robert V. Steinhilber appeals his conviction, by a jury, of violating the provisions of 15 U.S.C. § 1717. The indictment alleged that Steinhilber knowingly and willfully made untrue statements of a material fact in a "Statement of Record" filed with the Department of Housing and Urban Development, an agency of the United States of America. The principal issues on appeal are whether the evidence was sufficient to prove that the statements were false, and, whether the evidence was sufficient to prove that Steinhilber "knowingly and willfully" made false statements. Finding the evidence insufficient to prove that Steinhilber "knowingly and willfully" made false statements, we reverse and order the entry of a judgment of acquittal.

The two count indictment charged that on May 23, 1969, and May 25, 1969, Steinhilber made identical misrepresentations, relative to the housing development he was involved in, to the Department of Housing and Urban Develop-

ment. In a "Statement of Record" filed with the Government, Steinhilber was asked to "[s]tate the availability of the water supply and whether the supply will be adequate to serve the anticipated population of the area." Steinhilber answered, in part, "Current programming by the village calls for the installation of a water tank with a capacity of 304,000 gallons of water. *This tank is being constructed* and is scheduled for installation this year.", and "In addition, the village has made arrangements for future use of Lake Winnebago as a source of water and a *purification plant is now being built.*" (Emphasis supplied.) The Government claims that the emphasized portions of the preceding quotations were false, and were knowingly and willfully made with knowledge of their falsity.

Steinhilber was a developer of a housing development known as Lake Winnebago. Steinhilber was also on the Board of Trustees of the incorporated Village of Lake Winnebago. On March 14, 1969, the Village of Lake Winnebago entered into a contract with Universal Tank & Iron Works, Inc., (Universal) for the construction of a 300,000 gallon above ground water tank. Thereafter "engineering function drawings" and "foundation drawings" were prepared. Steel was ordered for fabrication of the tank. The site for the tank was surveyed, and soil samples were taken and the test results were submitted to Universal. On May 5, 1969, Universal was paid the sum of $2,790. On that same day a letter was written to Universal by a Mr. Hart at the direction of Steinhilber which said in pertinent part:

"I am writing to inform you to place the 304,000 gallon water tank on a 'Hold Stand-by Status' until further notice. This is required due to labor conditions that now exist in the Kansas City area. . . .

As bad as we would like to try to get the installation work done, there are certain 'nasty' aspects of the strike that have required almost all in the home building industry to strictly en-

force this 'shut down'. We will keep you informed as to the earliest possible date for installation.

We do desire to hold this contract in effect and as soon as the labor conditions are settled we will activate the work order for you to proceed. I will return shop drawings tomorrow with related data."

The letter was received by Universal on May 7, 1969. On June 11, 1969, Universal advised Mr. Hart, by letter, that "with the 'hold' status still applicable on this contract, and with no apparent reconciliation of the problem in view, we can only allot to this project a lesser priority in our production schedule and proceed with other work that is unencumbered. . . ."

Sometime near the 1st of April, 1969, the Village of Lake Winnebago and the Eimco Corporation entered into a contractual relationship whereby Eimco agreed to construct a water purification plant for the Village. The engineering planning of the project was then begun by Eimco. On May 7, 1969, Eimco received a letter from Jack Hart, written at the direction of Steinhilber, and dated May 5, 1969, the pertinent parts of which were almost identical with the letter to Universal quoted above.

On May 9, 1969, Eimco wrote a letter to the Village of Lake Winnebago stating that "[w]e are continuing with the drawings and this particular 'Hold' will not interfere with those at all . . . ." On May 21, 1969, and June 3, 1969, Eimco requested approval of shop drawings. On July 14, 1969, Eimco acknowledged receipt of the shop drawings as approved. Fabrication for the plant was to take approximately four and one-half months, and on September 4, 1969, Eimco directed a wire communication to its Kansas City agent inquiring relative to the Lake Winnebago project: "Please advise status of strike. Our management is anxious to ship as quickly as possible. . . ." On October 23, 1969, a memo was directed to the Kansas City agent relative to the

Lake Winnebago job: "We are waiting for your advice on this job. We now have the equipment manufactured and will be faced with storage charges if we cannot ship. Will the customer accept shipment?"

Neither the water tank nor the water purification plant, which were to work in conjunction with each other, was ever placed at the Lake Winnebago development. From approximately April 1, 1969, to October 1, 1969, there was a construction labor strike in the Kansas City area.

### Sufficiency of the Evidence

■ As Steinhilber properly concedes, our standard of review with regard to challenges to the sufficiency of the evidence must be that which views the evidence in the light most favorable to the Government, with all the inferences which may be properly drawn therefrom. *See, e. g.,* Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). But as we have often said:

> "It is true that the government is entitled to the benefit of all reasonable inferences to be drawn from the evidence. However, where the government's evidence is equally strong to infer innocence of the crime charged as it is to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal. . . ." United States v. Kelton, 446 F.2d 669, 671 (8th Cir. 1971). *Accord,* United States v. Williams, 470 F.2d 1339, 1343 (8th Cir. 1973).

Throughout the trial of this case both parties attached different meanings to the phrases "being constructed" and "being built". Steinhilber argued that on the dates the statements were made the *construction process* had begun, while the Government contended that *actual construction* had not begun at the time the statements were made.

It is Steinhilber's contention that the phrases "being constructed" and "being built" are subject to two different meanings and are therefore ambiguous. Consequently, he contends that it was incumbent upon the Government to "negative any reasonable interpretation that would make the defendant's statement factually correct." United States v. Diogo, 320 F.2d 898, 907 (2d Cir. 1963). *See also* Johnson v. United States, 410 F.2d 38, 45 (8th Cir.), cert. denied, 396 U.S. 822, 90 S.Ct. 63, 24 L.Ed.2d 72 (1969). The Government argues, on the other hand, that the words had only one accepted meaning and therefore it was for the jury to determine whether the statements were false by applying the commonly understood meaning of the terms. *See* Seymour v. United States, 77 F.2d 577, 584 (8th Cir. 1935).

■ We note the ambiguity question because it pertains to whether Steinhilber "knowingly and willfully" made false statements. The importance of this problem was aptly pointed out in United States v. Diogo,[1] *supra,* 320 F.2d at 906 n. 6:

> "In prosecutions for . . . false representations the problem of interpreting ambiguous statements is frequently merged into the issue of *mens rea.* . . . If a defendant has not intended, by his statement, to assert the proposition which the Government has proved to be false, then he cannot ordinarily, of course, be said to have 'knowingly' uttered a false statement. . . ."

It is undisputed that the Government was required to prove that Steinhilber

---

1. We are unaware of any reported decisions dealing with the false statement provisions of 15 U.S.C. § 1717. As a consequence, throughout this opinion, we have made reference to decisions based upon other false statement statutes. *See, e. g.,* 18 U.S.C. § 1001. 15 U.S.C. § 1717 differs somewhat from other false statement statutes in that it uses the word "willfully", but does not also use the word "knowingly". The jury in this case was instructed that the false statement must be made both "willfully" and "knowingly". The Government does not challenge the propriety of the instruction. In any event, we think the term "willfully" encompasses the element of "knowingly" for the purposes of this statute.

made the statement "knowing" it to be untrue. As early as 1875 the courts in this Circuit recognized that the word "knowingly" meant that the defendant must have a "certain and clear perception of the falsity of the claim made." United States v. Bittinger, 24 F.Cas. 1150 (No. 14,599) (W.D.Mo.1875). Mr. Justice Blackmun while a member of this Court, has reminded that "carelessness or lack of wisdom is not equivalent to [a] knowledge of falsity . . .." Jacobs v. United States, 359 F.2d 960, 966 (8th Cir. 1966). And as this Court has emphasized:

> " 'Often the line between honest belief and purposeful misrepresentation is fine and indistinct, between the two however lies guilt or innocence, and where the evidence is evenly balanced between guilt and innocence, a conviction cannot stand.' " Gay v. United States, 408 F.2d 923, 931 (8th Cir.), cert. denied, 396 U.S. 823, 90 S.Ct. 65, 24 L.Ed.2d 74 (1969), quoting Estep v. United States, 140 F.2d 40, 45 (10th Cir. 1943).

In determining whether a statement is made with knowledge of its falsity:

> "[i]t is well established that we must look to the meaning intended by the [defendant], rather than to the interpretation of the statements which the . . . authorities *did in fact make,* or even to the interpretations which the authorities *might reasonably have made.* . . ." United States v. Diogo, *supra,* 320 F.2d 905–906.[2]

■■ Following these principles, we hold that here the meaning of the words in question was ambiguous and the Government had the burden of negating the claim that the defendant "did not know the falsity of his statement at the time it was made, or that it was the product of an accident, honest inadvertence, or duress." Bryson v. United States, 396 U.S. 64, 69–70, 90 S.Ct. 355, 359, 24 L. Ed.2d 264 (1969). In our opinion, this burden was not met. Without contradic-

tion, the evidence demonstrated that Steinhilber never intimated or stated prior to making the alleged false statement that the tank and the water plant would not be placed in working order at the development. At that time money had been paid to Universal, surveys of the tank site had been made, soil samples had been taken, steel had been ordered, and engineering and shop drawings had been started. Likewise, with regard to the purification plant, it is clear that engineering and design work continued through the month of May, and significantly it appears that the water purification plant was eventually built.

Of equal significance, we think, is the testimony of the Universal and Eimco officials with regard to the meaning of the words "being constructed" and "being built". Both officials unequivocally testified, as government witnesses, that such activities as design and engineering drawings were part of the "construction process". But when the government counsel asked whether Universal or Eimco had actually put together the tank or the water purification plant at the time the statements were made the officials answered in the negative. This further strengthens Steinhilber's contention that his choice of words was ambiguous, and subject to two meanings.

The Government's case primarily rested on the two letters placing the tank and the water purification plant on a "Hold Stand-by Status". We do not think, however, that these letters have any tendency to prove that Steinhilber "knowingly" lied some two and one-half weeks later when he said the tank was "being constructed" and the "water purification plant" was "being built". The letter to Universal clearly stated that the contract was not to be cancelled. And importantly the letter spoke essentially of delaying *installation,* and it indicated that shop drawings would be returned the next day. This evidence, coupled with the fact that Universal did

---

2. We obviously do not mean that the jury must accept as conclusive the meaning suggested by the defendant *at trial.* Rather

the inquiry is: what did the defendant mean *when he uttered the words?*

not place the construction of the tank on a lesser production priority until June 11, 1969, leads us to the firm conclusion that the construction process could very well have been understood by Steinhilber to be under way on May 23, 1969, and May 25, 1969. Furthermore, the Eimco letter, very similar to the Universal letter, clearly did not stop the "construction process" as understood by Steinhilber because two days after receipt of the letter Eimco wrote that the " 'hold' will not interfere" with the continued preparation of the shop drawings. And the evidence indicates that on May 23, 1969, and May 25, 1969, Eimco was continuing to work on the shop drawings.

If this were a contract action, we might be constrained to strictly construe Steinhilber's words against him. This, however, is a criminal action. Put simply, we do not believe that the Government proved beyond a reasonable doubt that Steinhilber knowingly and willfully made false statements in his answers to the questions.

For the reasons hereinbefore expressed, the judgment of conviction is reversed, and the trial court is ordered to enter a judgment of acquittal.

GIBSON, Circuit Judge (dissenting).

I respectfully dissent. The majority's statement of the law is precise, however, my disagreement lies with the application of the law to this case. In short, the majority holds that the District Court had a duty to direct an acquittal on the grounds that the evidence was *equally* strong to infer innocence since the phrases alleged by the Government to be false were so ambiguous as to indicate that the defendant could not have had the requisite *mens rea*. Implicit in such a holding is the conclusion that the jury has not made a reasonable inference that the defendant "knowingly and wilfully" made false statements to the Department of Housing and Urban Development (HUD).

Concededly, the phrases "being constructed" and "being built" and the factual circumstances in this case could lead to differing inferences. One inference that could be made and *could* have been accepted by the jury is that the defendant interpreted his initial dealings with Universal and Eimco to mean that the tank and plant were "being constructed" and "being built," and, therefore, his statements to HUD were not false and he did not possess the requisite *mens rea*. Another inference can be made and must have been found by the jury, since a verdict of guilty was rendered. The jury, in order to have been consistent with its verdict, must have concluded that the defendant knew that the tank and plant were not now "being constructed." A "hold by" status was placed on the water system two weeks prior to the statements and no actual "on site" work was being performed at the time the defendant made the statements to HUD. Quite conceivably, the Kansas City construction strike was a convenient coincidence for the defendant to claim later that he was constructing the water system at the time the statements were made based on the preliminary matters accomplished and that his statements in this context were ambiguous. The fact that the water system was at the least being delayed and the failure of the defendant to so inform HUD can be viewed as strong evidence that the statements made were false and that the defendant knew them to be false. Further, the jury could have properly considered that, even despite the construction strike, a "hold" given at the defendant's direction on May 5, 1969, on the fabrication of the plant at Eimco's factory, was not necessary and offered circumstantial evidence on the defendant's wilfullness. A diligent developer would certainly have continued with the fabrication of the system, so that it could be installed immediately after the construction strike was terminated.

I cannot say, as the majority concludes, that the Government's evidence was *"equally* strong to infer innocence of the crime charged as it is to infer guilt." United States v. Kelton, 446 F. 2d 669, 671 (8th Cir. 1971) (emphasis

added). In reviewing the record in this case, I find that the Government's evidence established beyond a reasonable doubt that the statements made were false and that the defendant "wilfully and knowingly" made these false statements. The sole purpose of the statements was to secure HUD's approval of the project. Approval was predicated on representation of an existing fact that an adequate water supply system was in the process of being constructed and would be completed within the near future. Obviously the requirement is for the protection of the public in dealing with promoters who are long on promises and short on performance.

A reviewing court must accept the evidence in a light most favorable to the jury's verdict. West v. United States, 359 F.2d 50, 54 (8th Cir. 1966). Further, all conflicts in the evidence and all reasonable inferences as might be reasonably drawn from the evidence must be resolved in favor of the jury's verdict. United States v. Valez, 431 F.2d 622, 627 (8th Cir. 1970); United States v. Holt, 427 F.2d 1114, 1116 (8th Cir. 1970); Hanger v. United States, 398 F.2d 91, 108 (8th Cir. 1968), cert. denied, 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124 (1969); Cross v. United States, 392 F.2d 360, 361 (8th Cir. 1968); Aron v. United States, 382 F.2d 965, 970 (8th Cir. 1967). Our jurisprudence is interwoven with the concept of democracy and accordingly places reliance upon a jury to try the facts of each case. The jury resolves conflicts in evidence, determines questions of fact, and reaches a verdict. The question of the defendant's wilfullness and the interpretation of the contested statements involved factual determinations for the jury to resolve. The jury's reasonable inferences that the statements were false and that the defendant knowingly and wilfully made those statements should be accepted by this Court.

Since the case was properly presented to the jury by the District Court's instructions, the jury's factual determinations should stand. I would affirm a judgment of conviction.