UNITED STATES of America, Plaintiff–Appellee,

v.

Norman Lester DACUS, Nevada Land Builders, Inc., Green Saddle Ranch Co., Defendants–Appellants.

No. CA 79–1043.

United States Court of Appeals, Ninth Circuit.

Argued Jan. 15, 1980.

Submitted March 17, 1980.

Decided Dec. 18, 1980.

Ruth L. Cohen, Asst. U. S. Atty., Las Vegas, Nev., for plaintiff–appellee.

John A. Greenman, Las Vegas, Nev., for defendants–appellants.

Before TRASK, TANG and FERGUSON, Circuit Judges.

TRASK, Circuit Judge:

Norman L. Dacus (Dacus) appeals from his conviction on thirteen counts of selling unregistered lots from a subdivision in violation of the Interstate Lands Sales Act

(the Act), 15 U.S.C. § 1703(a)(1).[1] He is joined in his appeal by two corporate defendants which stand convicted of various counts of the same offense.

Between the spring of 1972 and the summer of 1977, Dacus, some other individuals and the two corporate defendants, offered and sold to members of the public a number of lots from various developments in Pahrump Valley, Nye County, Nevada. Dacus, individually and through his corporations, either owned or obtained brokerage rights to a number of parcels of land in the Pahrump Valley. During the period of the indictments, Dacus marketed the lots through one main office. He used a number of salesmen to show lots to prospective purchasers and advertised all eight development parcels in which he had ownership or brokerage interests under a common name, usually "Pahrump" or "Nevada Land Builders, Inc.". In the course of his sales business, Dacus employed the mails and various means of interstate transportation and communication.

None of the developments, which included (1) Green Saddle Ranch, (2) Roadrunner, (3) Green Valley Acres, (4) Spring Mountain Industrial Park, (5) Kimberly Place, (6) Conestoga Country Estates, (7) Western Village, and (8) Charleston Commercial Center, were ever registered as subdivisions with the Department of Housing and Urban Development (HUD). The total number of lots in all the developments, as shown by plat maps admitted in evidence, exceeded 700.

Dacus first challenges the registration requirements of the Act as being unconstitutionally vague. He argues that the statute is so confusing that he was not put on notice that his conduct was prohibited. The registration requirement, 15 U.S.C. § 1703 (a)(1), plainly prohibits the use of interstate transportation or communication, or the mails, to sell or lease an unregistered lot in a subdivision. Dacus, however, argues that the statute's definition of "subdivision" made it unconstitutionally unclear whether his lots must be registered before sale.[2]

The statutory provision which is the key to this dispute is the definition of "subdivision" which provides in pertinent part:

> "[S]ubdivision" means any land, located in any State or in a foreign country, which is divided or proposed to be divided into fifty or more lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan and where subdivided land is offered for sale or lease by a single developer, or a group of developers acting in concert, and such land is contiguous or is known, designated or advertised as a common unit or by a common name such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan.

15 U.S.C. § 1701(3). The definition has two basic elements: (1) there must be 50 or more lots; and (2) the lots must be sold pursuant to a common promotional plan. Although "common promotional plan" is not defined, the statute does provide that a common promotional plan will be presumed if the lots are contiguous or are known or advertised as a unit or under a common name. Other means of proving a common promotional plan are not foreclosed.

1. Section 1703(a)(1) provides:

It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails—

(1) to sell or lease any lot in any subdivision unless a statement of record with respect to such lot is in effect in accordance with section 1706 of this title and a printed property report, meeting the requirements of section 1707 of this title, is furnished to the purchaser in advance of the signing of any contract or agreement for sale or lease by the purchaser.

2. It should be noted, although it does not affect our analysis of the constitutional questions presented, that appellants could have avoided any liability under the Act by the simple expediency of registration, or by obtaining an exemption advisory opinion from the Office of Interstate Land Sales Registration as provided for in 24 C.F.R. § 1710.15 (1979).

■ Dacus' challenge to the constitutionality of this statute must fail for two reasons. First, whether or not a statute is unconstitutionally vague must be assessed in the context of the particular conduct to which it is being applied. *United States v. National Dairy Products Corp.*, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); *United States v. Bohonus*, 628 F.2d 1167 (9th Cir.), *cert. denied,* —— U.S. ——, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980). In the present case, there can be no doubt that the sales procedures employed by Dacus in disposing of the lands in his various subdivisions constituted a common promotional plan within the meaning of the statute. The lands were known collectively by one or two common names, were offered in aggregate newspaper advertisements, and were sold through one sales office by salesmen who had authority to sell parcels from any of the various developments and who would frequently show parcels from a number of developments to a single purchaser. Appellants' sales scheme falls easily within the ambit of the Act's regulation; the mere fact that appellants sold lots from a number of variously named developments does not avoid the Act's requirements. *See Wiggins v. Lynn*, 406 F.Supp. 338 (E.D.Tex.1975) (similar sales scheme involving 18 variously named developments constitutes sales of lots in a "subdivision" for purposes of 15 U.S.C. § 1701(3)).

■ Second, the statute does not appear constitutionally infirm on its face. A statute may be struck down for vagueness if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972), or if it "leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Giacco v. Pennsylvania*, 382 U.S.

399, 402–03, 86 S.Ct. 518, 520–21, 15 L.Ed.2d 447 (1966).

■ The structure of the subdivision definition contemplates that the existence of a common promotional plan may have to be proven if insufficient facts are established to trigger the statute's common promotional plan presumption. The statute was so construed in *Dunaway v. Lewis*, 554 P.2d 110, 112 (Okl.App.1976). The meaning of the term "common promotional plan" in the context of the subdivision definition is neither standardless nor vague. This Act gives people of ordinary intelligence fair notice of the sort of conduct which is prohibited. *See United States v. Bohonus, supra.*

■ Dacus next contends that the government failed to prove essential elements of the offense by neglecting to establish that there were 50 lots offered for sale on the date of each count of his indictment. This overstates the government's burden under the Act. In order to sustain a conviction for any given count, there need only be substantial evidence that each lot sold was one of 50 or more that could be associated as being part of the same common promotional plan. The other lots in the common promotional plan may have been sold already, or they may be only a gleam in the developer's eye. Neither circumstance avoids the statute's prohibition. It is only required that the parcels in the common promotional plan have been divided or that they are proposed to be divided into 50 or more lots.

We must next determine whether there was substantial evidence, taken in the light most favorable to the government, supporting the verdict as to each count of the indictment. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1941); *United States v. Lincoln*, 494 F.2d 833, 840 (9th Cir. 1974).[3]

■ There was ample evidence from which the jury could have concluded that

---

**3.** In considering this issue we were aided by supplemental briefs filed by both parties at the request of the court.

there was a common promotional plan involving more than 50 lots at the time of the lot sales on which most of the counts were based. There is evidence in the record which substantiates that Dacus' development plan encompassed over 50 lots by May of 1973, and over 700 lots by March of 1974.[4] Consequently, there is substantial evidence supporting the convictions of Dacus and the corporate defendants with regard to most of the counts of selling unregistered lots.

With regard to three of the counts on which Dacus and one of the corporate defendants were convicted, however, we are unable to find substantial evidence supporting the defendants' convictions. Counts 15, 16, and 17, were each based upon the sale of certain lots to a particular purchaser on July 25, 1972. The record is devoid of evidence that would establish that Dacus' "common promotional plan" involved 50 or more lots at that early date. The sales upon which the three counts were based were from three developments, Roadrunner, Kimberly Place, and Conestoga Country Estates. Although there may initially have been more than 50 lots in these subdivisions, individually or collectively, the record fails to establish the number of lots in which the appellants ever had ownership or brokerage rights.[5] There is, therefore, not substantial evidence that the sales which occurred in 1972 were in violation of the registration requirements of the Act. Consequently, the defendants' convictions of these three counts must be reversed.[6]

Appellants next contend that the district court erred in giving a detailed instruction defining "common promotional plan."[7] Appellants contend that the instruction impermissibly broadened the scope of the term beyond the intent of Congress. The term "common promotional plan" was left undefined by Congress, and appellants

---

4. Exhibits received into evidence at trial establish that on May 7, 1973, Dacus recorded plat maps for Green Valley Acres and Spring Mountain Industrial Park showing these subdivisions to contain 33 and 20 lots, respectively. Witness Caselli testified that the Green Saddle Ranch subdivision was tentatively divided into over 700 lots when he began surveying it in 1974. A final subdivision map approved by Caselli, as County Surveyor, on March 5, 1974, shows Green Saddle Ranch to have contained 812 lots. 42 lots were later added to this subdivision based on surveying completed July 30, 1974. Exhibits and testimony by Caselli and other witnesses clearly establishes that Dacus, Nevada Land Builders, or the Green Saddle Ranch Company owned these properties at the dates mentioned above.

5. For example, a plat map filed in 1970, a copy of which was given to a purchaser in 1975, indicated that Conestoga Country Estates had well in excess of 50 lots. The map, however, was filed by persons other than the appellants, who obtained their interests in the development at a date after 1970. The record does not disclose how many lots were still available at the time the appellants acquired their interest in the development. Similarly, the record contains a brokerage agreement establishing the appellants' interest in the Roadrunner subdivision and covering many acres. There is no evidence, however, of the number of lots into which these acres were divided.

6. Appellant Green Saddle Ranch Company was convicted of Count 24 only and is therefore not affected by this holding. Appellant Dacus was convicted of 13 counts. He was sentenced to one year on each count, the sentences to run concurrently. Consequently, the reversal of these three counts will not affect his sentence. Appellant Nevada Land Builders, Inc., was convicted on 12 counts, sentenced to a $2,500 fine as to Count 15, and had all other fines stayed by the district judge. Our holding will reverse appellant's conviction of Count 15, so we will remand for resentencing.

7. The disputed instruction states:
Even if you do not find both of these elements [supporting a presumption of a common promotional plan] you must still find that a common promotional plan existed if you find a sufficient number of the following to convince you beyond a reasonable doubt that the sale of lots in the various parcels of land were being made as part of a common enterprise;
They are that the defendant developers acted through common sales agents. That defendant developers acted through common sales facilities such as a common office or offices with a common telephone number. That the sales activities were directed by a common sales manager. That the sales in the various parcels were made with the same developer executing the contract of sale. That common advertising was used for the various subdivisions. That the lots were treated by defendants as part of a common inventory.

cite us to no authority supporting their restrictive interpretation of congressional intent. The instruction given by the district court was clear, structured in accordance with the evidence in this case, and does not appear unfair or prejudicial to appellant. It does not appear to us that this instruction "was misleading or represented a statement inadequate to guide jury deliberations." *United States v. Grayson*, 597 F.2d 1225, 1230 (9th Cir.), *cert. denied*, 444 U.S. 873, 875, 100 S.Ct. 153, 157, 62 L.Ed.2d 99, 102 (1979). We do not find the giving of this instruction to be reversible error.

■ Finally, Dacus contends that the district court erred in failing to instruct the jury that specific intent is a necessary element of a violation of 15 U.S.C. § 1703(a)(1), citing *United States v. Steinhilber*, 484 F.2d 386 (8th Cir. 1973). Appellants' reliance on *Steinhilber* is misplaced. *Steinhilber* dealt with a conviction under a different statute, 15 U.S.C. § 1717, for willfully making untrue statements or omissions of material fact.

This court noted in *Schenker v. United States*, 529 F.2d 96 (9th Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 79 (1976), that the Interstate Land Sales Act was modeled on the Securities Act of 1933 (15 U.S.C. §§ 77a et seq.). In Securities Act cases, specific intent is not a required element of mere registration requirements. *See United States v. Murdock*, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933). Specific intent or scienter is only required when the crime charged is based on fraudulent conduct, as it was in *Steinhilber*, but is not here. Consequently, the district court's instruction in this case was proper.

Most of appellants' assignments of error are unpersuasive. We do find, however, that there was insufficient evidence to support appellants' convictions on Counts 15, 16, and 17. Consequently, we affirm in part, reverse in part, and remand.