**SECURITIES AND EXCHANGE COM-MISSION, Plaintiff-Appellee,**

v.

**INTERNATIONAL CHEMICAL DEVELOPMENT CORPORATION et al.,**
**Defendants,**

and

**Golden Rule Associates et al.,**
**Defendants-Appellants.**

**Nos. 72-1180 to 72-1183.**

United States Court of Appeals,
Tenth Circuit.

Nov. 6, 1972.

Richard E. Nathan, Asst. Gen. Counsel, S. E. C. (G. Bradford Cook, Gen. Counsel, David Ferber, Sol., and James J. Sexton, Atty., S. E. C., on the brief), for plaintiff-appellee.

M. Byron Fisher, of Fabian & Clendenin, Salt Lake City, Utah, for appellant John D. Smith.

Dean E. Conder, of Nielsen, Conder, Hansen & Henriod, Salt Lake City, Utah, for appellants Golden Rule Associates, Richard T. Cardall, Ray L. Pruett and Joseph A. Holman.

Frank J. Allen, Salt Lake City, Utah, for appellants Frank Lloyd Parks and John A. Syphers.

Before LEWIS, Chief Judge, and McWILLIAMS and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

## I.
## NATURE OF THE CASE

The defendants-appellants were enjoined in the district court pursuant to various sections of the Securities Act of 1933 and the Securities Exchange Act of 1934. Specifically, they were enjoined from further violations of the registration requirements, the antifraud provisions and reporting requirements provided for in these acts.[1]

The case was tried on its merits to the court, and following a three day presentation of evidence an injunction was entered enjoining the defendants from continued violations of the mentioned provisions.

Originally, there were 17 defendants. One of these was not served; two failed to answer and were defaulted; a consent decree was entered against one; and one agreed to an order based upon its stipulation. The defendants, International Chemical Development Corporation, Intermountain Chemical, Inc., MFTD Corporation, William L. Allen and James G. Macey, although enjoined by the court from violating one or more sections of the act, did not prosecute appeals. The defendants-appellants include Golden Rule Associates, Richard T. Cardall, Joseph A. Holman, Ray L. Pruett and Frank Lloyd Parks, all of whom were enjoined from continued violations of the registration, antifraud and reporting

1. Sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c). Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. 240.-10b–5. Sections 12(g), 13(a), and 16(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78l(g), 78m(a), 78p(a) and Rules 13a–1, 13a–11, 13a–13, 16a–1 thereunder.

provisions. Appellant Syphers was enjoined from violating the registration and antifraud provisions; Smith was enjoined from further violations of the registration provision.

The SEC's theory of the case was that the defendants were engaged in a fraudulent stock promotion scheme which involved the use of a corporate shell which had no substantial assets, but which was given, according to the SEC, the appearance of substance so that stock which the corporation issued would have a market. It is claimed that the individuals and the corporation sold the stock, but failed to carry out the avowed objective of the corporation which was to develop the minerals in the Great Salt Lake.

## II.

### THE CORPORATE RELATIONSHIPS

There are numerous satellite corporations, none of which had any substance and which undoubtedly were formed with particular objects and purposes; it is not entirely clear how or the extent that they fit into the alleged fraudulent scheme.[2] Nevertheless, some mention must be made as to the activities of these satellites because their presence did contribute at least in some degree to the acts complained of by the SEC in seeking injunctive relief.

The central corporation in the controversy is International Chemical Development Corporation. It is the stock of this company which was marketed and which was the basis for the filing of the complaint and the relief granted. Its history shows that throughout its relatively long life it has been a shell organization which from time to time has merged with other similar organizations and has been otherwise inactive except for changes in its name. The International Chemical Development Corporation was originally formed in September 1954 and was called American Duchess

Uranium and Oil Company. It was formed under the laws of the State of Nevada. It distributed 281,635 shares of its stock to the public under a Regulation A exemption. It appears to have been inactive until 1958, at which time the name was changed to American Duchess Oil and Metals Company.

In 1964, this company issued eight million shares. Later these were reduced by means of a reverse split to 400,000 shares, so as to obtain a controlling interest in Great Western Motor Clubs; 100,000 shares were given to the defendant Holman for this interest.

In the year 1964, American Duchess merged with Horizen Products, Inc., exchanging 1,500,000 shares for 1,000 shares of Horizen. In connection with this, the defendant Cardall received 121,500 shares and Syphers, who was head of the corporate transfer agent for ICDC, received 120,000 shares.

The next year American Duchess' name was changed to International Land Development Corporation and later (in 1968) it became International Chemical Development Corporation. On the occasion of the change of name there were 2,181,635 shares of stock outstanding, but at no time was the stock of this company registered. There was a registration Regulation A offering, as previously noted, in connection with American Duchess Uranium and Oil Company, and the defendants at times relied on this in an effort to show some semblance of compliance with the registration requirements of the Act.

The events which the SEC regarded as significant which led up to the launching of International Chemical Development Corporation included the following:

Early in 1968, the defendants acquired stock of the International Land Development Corporation which was the immediate predecessor of International Chemical Development Corporation.

2. The confusing tangle of corporate entities brings to mind the famous words of Walter Scott:

Oh, what a tangled web we weave, when first we practice to deceive!

In February of 1968, defendant Allen purchased 60,000 shares in International Land Development Corporation from Syphers.

The defendant Smith purchased options on 200,000 shares and Allen purchased options on a total of 185,000 shares held by other shareholders.

Pruett purchased 50,000 shares and Cardall acquired 700,000 shares on behalf of a non-profit company which he had formed called Golden Rule Associates, one of the defendants.

One other corporation which requires mention is MFTD Corp. This was formed in the spring of 1968 by defendants Holman, Smith, Syphers, Cardall and Allen. Its purpose was to provide factoring service for the accounts receivable of doctors and dentists. It turned out to serve as an investment vehicle and as a depository for International Chemical Development Corporation stock. In February 1968, Allen, who was an officer of MFTD, purchased 60,000 shares on behalf of MFTD and Smith purchased options on 200,000 shares also on behalf of MFTD. Allen purchased a total of 185,000 shares and Pruett 50,000 shares. At about the same time, defendant Cardall acquired on behalf of the Golden Rule foundation some 700,000 shares of what later became Chemical company stock (then called Interland). These shares were all purchased prior to the activation of the chemical company and the acquisitions were for a few cents per share.

## III.
## ACTIVITIES OF INTERNATIONAL CHEMICAL DEVELOPMENT CORPORATION AND THE INDIVIDUAL DEFENDANTS

This illegal enterprise had its modern beginning in the summer of 1968, at which time a meeting was held to launch and activate the chemical company. Cardall, Allen, Macey, Holman, Pruett and Syphers had developed a plan to extract minerals from the Great Salt Lake. Holman, Pruett and Allen called a special meeting of Interland—the chemical company—at Elko, Nevada on October 8, 1968. At this shareholders meeting Allen was chairman and Holman was secretary. Also present were Cardall, Pruett and Macey. Macey, the owner of a solar evaporative process for extraction of lithium and potassium from the waters of the Great Salt Lake, spoke to the meeting explaining that he needed financing to construct evaporation ponds. He offered Interland an exclusive license to operate the properties and receive 90 percent of the proceeds. Interland would in turn issue a transfer of 2,500,001 shares to Intermountain Chemical, Inc. (ICI) which had been incorporated in April 1968 by Macey, Holman and Pruett to develop the evaporative process. The shareholders accepted this offer and at that meeting the name of Interland was changed to International Chemical Development Corporation. Defendant Macey, who was already president of ICI, was elected president, and Pruett was elected secretary-treasurer, an office which he held also in ICI. As of the time of this meeting Interland or International Chemical Development Corporation was clearly a shell. It had no corporate records and had no assets. The previously merged corporations had all gone out of business and there had been no filings with the SEC.

The next step was to develop a public market. In this connection, a September 1968 issue of Reader's Digest which had dealt with the mineral potentialities of the Great Salt Lake was widely used.

The defendant Parks, who resided in New York City, was mainly responsible for selling the largest block of stock, 500,000 shares. In November 1968, he agreed to purchase this stock from Golden Rule for a price of $650,000, and following this he actually sold his shares and paid the purchase price as sales were made. The shares were issued in connection with the individual sales. Parks had arranged for Macey to talk to broker dealers and investors, and through these efforts an over-the-coun-

ter market was created in various parts of the country.

In addition to the sale of the large block of the stock through defendant Parks, other defendants also made sales. Allen sold 50,000 shares through the defendant Cannon to a California broker dealer. In addition, there were pledges for the purpose of obtaining bank loans. The defendants Allen, Syphers, Holman and Smith exercised options to acquire 200,000 shares of ICDC stock on behalf of MFTD. The bulk of these shares, along with 50,000 shares acquired by MFTD Corp., were pledged with banks in Utah and Minnesota to secure loans in the amount of $200,000. The shares pledged with the Minnesota bank were sold through the defendant Moran in New York and the proceeds of these sales were used in part at least to pay back the bank loan, shares being released by the bank as sales were made and money was paid in.

The trial court found that defendants collectively, from October 1968 through midsummer of 1970, acquired some 1,700,000 shares of the 2,181,635 shares outstanding as of the October 8 meeting. The court further found that over 1,400,000 of these shares were sold or pledged for total assets in excess of one million dollars. It is not possible to substantiate these numbers. At the same time, it is apparent that a very large number of shares were acquired for a few cents a share and were later sold for prices ranging upward to a high of about $8.00. At least some of the money found its way back to ICI for the purpose of development. As of the time of the trial the court found that although there had been some evaporation ponds constructed and some showing of operation of the ponds, no minerals had been extracted.

The trial court also found that the defendants, with the exception of Smith, had made various false and misleading representations to investors and had omitted to disclose material facts. These included the representation that ICDC was extracting minerals from the Great Salt Lake; that it owned patents to a mineral extraction process; and that the stock had been purchased on the open market, was "free-trading" and was registered with the SEC. The omissions dealt with the failure to disclose that ICDC had no assets other than a contingent contract with ICI; that ICI owned the patents and was the operating company; that Macey and Pruett were officers in both; that the stock was not registered; that the money to develop and operate was to come from the sale of stock; and that the patents were not proven (to be commercially feasible).

ICDC went through the motions of filing with the SEC early in 1969, but the trial court found that this was fatally deficient in many respects in that it did not disclose the relationships and the interests and did not file periodical reports in accordance with § 13(a) of the 1934 Act, and that Holman, Pruett, Macey, Allen, Cardall, Parks and Moran did not file individual reports required by § 16(a) of the 1934 Act.

IV.

THE 10b–5 VIOLATIONS

The complaint alleged that the defendants with the exception of defendant Smith violated § 17(a) of the 1933 Act, § 10(b) of the 1934 Act and Rule 10b–5 issued pursuant thereto. Following presentation of the evidence, an injunction was duly entered enjoining them from further violations.

■ Golden Rule, Cardall, Pruett and Holman challenged the ruling as to 10b–5 violations and in part challenge the ruling that they violated § 17(a) of the 1933 Act. The purpose of both provisions is protection of investors from fraudulent practices. *See* SEC v. Capital Gains Research Bureau, Inc., 375 U. S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

■ *Parks* maintains that he neither made sales nor misrepresentations. We find, however, that there is ample evi-

dence to sustain the trial court's finding as to his violations. The 500,000 share lot was purchased by him and the fact that the sales were made nominally on behalf of Golden Rule Associates is of no consequence. In reality, they were made on behalf of the enterprise. Not only did Parks go to expansive lengths in creating a market as shown in the evidence, he represented that the financial condition of ICDC was quite good even at the time that it was defunct. There is also evidence that he represented that the corporation was actually engaged in extracting minerals. Furthermore, he omitted to state material facts. *See* In re American Trailer Rentals Co., 325 F. 2d 47 (10th Cir 1963). Finally, there can be no doubt about the interstate character of Parks' operation. *See* SEC v. F. S. Johns & Co., 207 F.Supp. 566 (D.N.J.1962).

■ Cardall on behalf of himself and Golden Rule Associates questions the sufficiency of the evidence as to him. However, he is shown to have used Parks as his agent to sell the shares which had been held by Golden Rule. There is also evidence that Cardall encouraged the activities of Parks in other ways.

■■ *Pruett's* and *Holman's* liability rests on letters and reports sent to ICDC shareholders and participation in a scheme which called for fraudulent sales. Pruett was a corporate officer and Holman was in a position of control.[3]

■ As to Syphers, it need only be said that he was an essential participant inasmuch as his company was the transfer agent. He carried out some overt acts, including participation in the obtaining of bank loans and the pledging of stock which was later sold. It is

quite true that the bank pledges which he is responsible for are not clearly shown by the evidence to be sales. This, however, does not detract from his aiding and abetting the entire scheme, whereby the injunctive action of he court directed to him was justified.

V.

## VIOLATION OF THE ACT GROWING OUT OF THE FAILURE TO REGISTER WITH THE SEC

The purpose of Section 5, 15 U.S.C. § 77(e), is to obtain a full disclosure of all the facts attending the distribution of securities, and Section 5(a) requires that there be an effective registration prior to sales of securities. Section 5(c) makes it unlawful for any person to make use of interstate commerce or the mails to offer to sell a security which has not been registered.

Although there are certain exemptions, no successful effort has been made by the defendants to establish these. *See* SEC v. Ralston Purina Co., 346 U.S. 119, 126–127, 73 S.Ct. 981, 97 L.Ed. 1494 (1953).

Under § 2(11), 15 U.S.C. § 77b(11), an underwriter is any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security or has a direct or indirect participation in any such undertaking. An issuer under this definition includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

Secondary distribution of outstanding securities is subject to the prohibitions of Section 5 where the redistribution takes on the characteristics of a new of-

---

3. Pruett and Holman contend that they have personally made no sales. They could be held liable for the sales made by Parks and other of their joint participants, but even if these sales were not attributed to them, it is clear that the false, deceptive letters and reports were directed at investors and broker dealers, in short to sales in the marketplace.

Corporate officers and agents are liable for injecting such false and deceptive publications into the marketplace, even if they are not simultaneously buying and selling for their personal accounts. *See* SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968), cert. denied, Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

fering by reason of the control of the issuer possessed by those responsible for the offering such as secondary distributions through underwriters by controlling stockholders. Thus, a primary inquiry is whether the defendants at bar are controlled or controlling persons within the meaning of the Act.

■ Rule 405, 17 C.F.R. § 230, 405(b), of the regulations issued pursuant to the 1933 Act defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract or otherwise." Thus, it is not based upon the percentage of voting power but rather is concerned with the realities of the situation.

■ Control is a question of fact. A significant test would be whether or not the person had enough influence to obtain an issuer's signature on a registration statement, *see* 9 A.L.R. Fed. 645 (1971), or when a group is involved, whether the person had sufficient influence with the group to be able to obtain the issuer's signature on a registration statement. *See* Loss, Securities Regulation 780–81 (1961). There is a conflict of authority as to whether mere membership in the group will suffice to make the member a control person. At bar this is not important because of the joint participation which is shown by the evidence. Therefore, all those individuals who purchase from an issuer-member of a control group with a view to distribution or who sell for an issuer-member of the control group as a part of the distribution are to be regarded as underwriters, and financial stake or other similar purpose is not essential. *See* SEC v. North Am. Research & Dev. Corp., 424 F.2d 63, 81 (2d Cir. 1970).

Still quite apart from the issuer or underwriter basis for liability, is liability arising from aiding and abetting or joint participation in the violation of Section 5. *See* SEC v. North Am., *supra*, at 82.[4] *See also* SEC v. Chinese Consol. Benevolent Ass'n, 120 F.2d 738, 741 (2d Cir.), cert. denied, 314 U.S. 618, 62 S.Ct. 106, 86 L.Ed. 497 (1941).[5]

Based upon the standards set out, we hold that the trial court was correct in finding and concluding that Cardall was an underwriter and issuer of ICDC stock within the meaning of Section 2(11) of the Act. The evidence was ample to support this finding and conclusion. An analysis of the specific evidence applicable to Cardall and Golden Rule is set forth in the Appendix to this opinion.

4. The court stated that

it should be apparent that Blumberg and Orenzoff [whose activities consisted of inducing others to purchase or to promote the distribution of unregistered stock] might have been enjoined even if they were found not to be underwriters. Whether their conduct is to be classified as joint participation or aiding and abetting, the statutory language "any person" and our decisions in *Culpepper* [SEC v. Culpepper, 2 Cir., 270 F.2d 241] and *Chinese Consolidated Benevolent Association* make it clear that being an underwriter is not a prerequisite to a finding of violation of Section 5.

5. Here it was said:

Even if the defendant is not itself "an issuer, underwriter, or dealer" it was participating in a transaction with an issuer, to wit, the Chinese Government. The argument on behalf of the defendant incorrectly assumes that Section 4(1) applies to the component parts of the entire transaction we have mentioned and thus exempts defendant unless it is an underwriter for the Chinese Republic. Section 5(a)(1), however, broadly prohibits sales of securities irrespective of the character of the person making them. The exemption is limited to "transactions" by persons other than "issuers, underwriters or dealers". It does not in terms or by fair implication protect those who are engaged in steps necessary to the distribution of security issues. To give Section 4(1) the construction urged by the defendant would afford a ready method of thwarting the policy of the law and evading its provisions.

The trial court found that Pruett and Holman were also issuers and underwriters within the meaning of Section 2(11). The evidence establishes that these men were active from the beginning in organizing ICI and in activating Interland. They participated in various of the transactions which have been described, all of which is shown in the appended analysis.

The trial court found that *Parks* was both an issuer and an underwriter, and the evidence supports this conclusion also. For a discussion of Parks' participation, see the Appendix.

The trial court also found that John D. Smith was both an issuer and an underwriter. Again, the evidence is substantial in support of the conclusion that his activities satisfied the standards of Sections 5 and 2(11). Again, a legal and factual analysis of his activities is found in our Appendix.

The trial court found as a matter of fact that appellant *Syphers* had originated the joint scheme to acquire the Interland stock and to involve this shell corporation in the mineral extraction plan. Other activities of Syphers are relied on such as his participation in the October 8 stockholder meeting, the issuance of the notices, his participation in the acquisition of stock by the defendants, his exercise of options on behalf of MFTD and his participation in the pledging or sale of these shares. For the reasons set forth in the Appendix, we must hold that the evidence is insufficient to support this conclusion that Syphers was either an issuer or an underwriter. At the same time, we believe that the evidence is adequate to support the court's enjoining Syphers from violations of Section 5 of the Act by reason of the intimate role which Syphers occupied in the undertaking as president of the corporate transfer agent of ICDC and as an officer of MFTD. The evidence is analyzed more fully in the Appendix.

We have made a painstaking study of this record with a view to ascertaining whether the evidence was indeed sufficient as to each and all of the defendants. From this, we have determined in final analysis that the conclusions are supported.

Accordingly, we have concluded that the judgment should be affirmed.

It is so ordered.

## APPENDIX TO OPINION

### ANALYSIS OF EVIDENCE IN SUPPORT OF SECTION 5 VIOLATIONS—DISTRIBUTION OF UNREGISTERED STOCK [1]

A. *Golden Rule Associates and Richard T. Cardall*

Cardall was both an issuer and underwriter within the meaning of Section 2(11).

Golden Rule, a non-profit foundation, was a corporate embodiment of Cardall and hence its transactions are to be attributed to Cardall. The evidence demonstrated that Cardall utilized the foundation form as a mechanism not only for his personal investments as well as an instrument in the present scheme, but also for many personal expenses. Golden Rule appears to have been a vehicle to avoid liability under the present laws. As such, it is a thinly disguised subterfuge which is ineffectual. *Cf.* Stadia Oil & Uranium Co. v. Wheelis, 251 F.2d 269, 275 (10th Cir. 1958).

Cardall is shown by the evidence to have been a control person. He participated in the 1968 discussion leading to reactivation of Interland, which had been a corporate shell. Cardall attended the October 8, 1968 meeting of Interland stockholders. He voted his stock and proxies in favor of the scheme to extract minerals from the Great Salt Lake. In

1. We deem it necessary to document the opinion from the standpoint of the evidence and the law in specific and particularized terms. We found the presentation in the briefs to be broad, general, sweeping, inadequate and demanding a more specific treatment.

December 1968, he created Golden Rule and accumulated on behalf of Golden Rule a total of 700,000 shares of ICDC stock. These shares represented approximately one-third of the shares outstanding at the time of the October 8 stockholders meeting, and approximately one-sixth thereafter.

Cardall argues that since he was neither an officer or director nor a controlling shareholder in ICDC he cannot, therefore, be a control person. He argues that "Defendant Macey owned fifty-one percent (51%) of the ICI and it in turn owned over fifty-one percent (51%) of ICDC." However, Macey was not entitled to exercise any power with respect to that stock unless and until earnings were realized from the extraction process. In any case, that percentage per se is not a definitive factor. In SEC v. Culpepper, 270 F.2d 241, 246 (2d Cir. 1959), it was held that the sale of stock of two stockholders who owned only one and one-half percent of the corporation's outstanding stock, but who were members of a control group which owned 45 percent, was the sale of stock by persons under direct or indirect common control with the issuer. Moreover, as was stated by the court in Pennaluna & Co. v. SEC, 410 F.2d 861, 866 (9th Cir. 1969), cert. denied, 396 U.S. 1007, 90 S.Ct. 562, 24 L.Ed.2d 499 (1970): " 'Control' is not to be determined by artificial tests, but is an issue to be determined from the particular circumstances of the case. . . . Under Rule 405, it is not necessary that one be an officer, director, manager, or even shareholder to be a controlling person. Further, control may exist although not continuously and actively exercised." (Citations omitted). Cardall's role in obtaining financing for ICDC when combined with his role in creating the scheme and with his stockholdings are sufficient to demonstrate actual control, even without officeholding. His active participation in the management of ICDC is most clearly shown by the sale arrangement between Golden Rule and Frank Parks which supplied between $280,000 and $300,000 to ICI for construction of the evaporative ponds. Moreover, his ability to compel registration is demonstrated through his aiding the others in filing the defective Form 10 statement with the SEC.

■■■ Cardall was also an active participant in the scheme to distribute ICDC stock. He agreed to sell, over a period of several months, approximately 500,000 shares of ICDC stock, held by Golden Rule, to Frank Parks. As is clear from the record, Parks sold these shares in varying quantities to numerous investors on the East Coast. Cardall received checks from the various investors; the proceeds amounted to approximately $750,000 and were in the name of Golden Rule. A majority of these funds were funneled through Golden Rule to defendants Cardall, Glaser, Holman, Pruett and Macey, but pursuant to a financing agreement between Golden Rule and ICI, $280,000 to $300,000 were funneled back to ICI and used to create an appearance of the development and operation of the mineral extraction process. Cardall also sold, on behalf of Golden Rule, some 38,000 shares to acquaintances of Parks and these shares were resold to numerous investors. Finally, Cardall testified that he travelled to the Bahamas to "open up a market" for ICDC stock. In sum, Cardall is an underwriter within the meaning of Section 2(11) in that he was selling for an issuer as part of the distribution. He joined with other defendants in the scheme, controlled a sizeable block of stock, made possible the continuation of the scheme, and promoted the distribution of unregistered stock.

B. *Ray L. Pruett and Joseph A. Holman*

■■■ *Pruett* joined with Macey and Holman to organize ICI in April 1968. Pruett held stock in this corporation and was its secretary-treasurer. Pruett was actively involved in reactivating Interland and purchased 50,000 shares of Interland stock in September 1968. He aided in mailing letters to stockholders

announcing the October 8 meeting and subsequently attended the meeting and voted his shares in favor of the proposal to extract minerals from the Great Salt Lake. He served as secretary-treasurer and director of ICDC. He signed the exclusive licensing agreement between ICI and ICDC as secretary-treasurer of both companies. His signature appeared on many letters mailed to ICDC stockholders informing them of ICDC's activities. These actions sufficiently demonstrate that Pruett was a control person of ICDC because of both his activities and officeholding. Moreover, under the test of control as the ability to compel the filing of a registration statement, Pruett qualifies by his testimony that he and Holman were primarily responsible for the defective registration statement that was filed with the SEC in January 1969.

■ Pruett's main argument for not being an underwriter is he did not sell any stock. He overlooks that he was an active participant in MFTD which pledged and sold ICDC stock. Pruett is also liable as a participant in the distribution of unregistered securities. There is no doubt that he aided in publicizing the ICDC operations to the stockholders and the investing public. Pruett testified that he was in frequent contact, as secretary, with transfer agent Syphers regarding the transfer of various stock certificates. He thus by his own admission had knowledge of the widespread sales, and there is evidence that Pruett was involved in the payment in stock to the electrical contractor at the ponds and to the ICDC resident agent in Nevada.

An interesting comparison to Pruett is presented in SEC v. North Am. Research & Dev. Corp., 424 F.2d 63, 81 (2d Cir. 1970), with respect to the liability of one Dillman. The trial court found that Dillman, North American's President who helped in the preparation of a "Progress Report," did not have a sufficient nexus with the distribution to warrant a finding that he was a partici-

pant. D.C., 280 F.Supp. 106, at 121. The circuit court vacated this finding and remanded for further consideration, stating:

> We have already held that North American was properly included in that part of the preliminary injunction dealing with Section 5 because it was an "issuer" and through its officers and agents performed numerous acts in respect of the various transfers of the stock. As North American's President, we think Dillman could not properly be eliminated as a non-participant in the scheme, especially as he signed and helped to prepare the Progress Report, which was transmitted through the mails and by means of interstate transportation facilities in the offer and sale of the unregistered North American common stock. Even if he did not directly cause the Progress Report to be transmitted in violation of Sections 5(a)(1) and 5(c) of the Securities Act, he aided and abetted the furtherance of the unlawful scheme by the major participants.

424 F.2d at 81. Pruett's actions when compared with those of Dillman's show greater culpability.

In sum, Pruett joined with other defendants in the entire enterprise starting with the launching of the ICDC shell and continuing through financing the pond scheme and the distribution of ICDC stock.

Appellant *Holman* also argues that he was neither a member of the control group nor a joint participant because he was not an officer in ICDC and held little stock in ICDC, selling none of it.

■ As to control, Holman received 100,000 shares of Interland in its acquisition of Great Western Motor Club during 1964. There is no evidence that Holman acquired additional shares of ICDC during the period in question. However, he was a substantial shareholder in ICI which in turn received 2,500,000 shares of ICDC under the agreement between the two companies.

Holman's role in ICI is not clearly delineated in either the evidence or the trial court's findings, but he appears to have been influential in management and operation. His role in ICDC was more than that of a passive shareholder. He testified that the idea to use Interland as the financing vehicle for ICI's plan was his own and that he suggested the possibility of acquiring Interland during discussions with other defendants. In addition, he was active in mailing the letter announcing the October 8 stockholders meeting and he attended that meeting and voted his stock in favor of the proposed scheme. He was acting secretary of that meeting. Holman also testified that he suggested that ICDC contact the SEC concerning the distribution of its stock. Along with other principals, Holman attended a meeting with a local SEC staff member. Thereafter, Holman was active in the filing of the defective form with the SEC.

 With respect to liability as an underwriter, Holman was active in the distribution of ICDC stock. It was he who arranged for Smith and Allen to obtain options on some 300,000 shares of Interland stock. Holman was an organizer of MFTD which sold and pledged ICDC stock. Holman "loaned" his 100,000 shares to Cardall and evidence showed that these shares were subsequently sold to numerous investors.

### C. *Frank Lloyd Parks*

Appellant contends that he was not a control person, and therefore not an issuer within the meaning of Section 2(11), because he was not among the original reorganizers and took no active role in the management of ICDC. Further, appellant contends that there is no evidence that he sold any ICDC stock and, therefore, he cannot be a statutory underwriter under Section 2(11).

The trial court found, as a matter of fact, that Parks served as a conduit through which stock acquired from Golden Rule was sold to investors in New York. The trial court also found that control was maintained by the financial dependence of ICDC upon Parks and other defendants. The trial court concluded, as a matter of law, that Parks was both an issuer and an underwriter under Section 2(11).

 As to Parks' liability as an issuer, it is clear that membership in a control group can arise over a period of time and need not be present at the outset or continuous. Therefore, Parks' argument that he was not among the original organizers is unavailing if he became a member of the control group within the crucial time. The evidence demonstrates that Parks did hold an official title with ICDC—that of nominal financial adviser. Although the evidence does not show that Parks had an active role in the management of ICDC per se, the record does reflect Parks' distribution of ICDC stock in New York at the behest of and in combination with Cardall, an issuer. These efforts provided the funds needed for the ponds. These funds were funneled back through Golden Rule to ICDC. It seems clear, therefore, that Parks was within the control group.

 As to underwriter liability, Parks' contention that he did not sell any ICDC stock is also without merit. The evidence shows that Parks arranged to purchase some 500,000 ICDC shares from Golden Rule. As the mass of checks introduced as exhibits show, Parks served as a conduit for the distribution of these shares to numerous investors. Parks simply transferred the checks to Golden Rule for the stock which he conveyed to the investors. In some instances, he relayed the name of the investor and the amount such investor was to receive and the stock was transferred directly. As to Parks' purchase of shares from Golden Rule, an issuer within the meaning of 2(11), with a view to ultimate distribution to the public, he was an underwriter within the meaning of Section 2(11). His participation was a vital aspect in the steps necessary to the distribution. *Cf.* SEC v. North Am. Research & Dev. Corp.,

424 F.2d 63, 81 (2d Cir. 1970). He was unquestionably one who participated or had a direct or indirect participation in the undertaking. SEC v. Culpepper, 270 F.2d 241 (2d Cir. 1959); SEC v. Chinese Consol. Benevolent Ass'n, 120 F.2d 738 (2d Cir.), cert. denied, 314 U. S. 618, 62 S.Ct. 106, 86 L.Ed. 497 (1941). Moreover, it is unnecessary to demonstrate that he knew all aspects of the scheme involved even if we were to assume such an argument were tenable in this instance. *See* SEC v. North Am. Research & Dev. Corp., 280 F.Supp. 106, 122 (S.D.N.Y.1968), aff'd in part and vacated in part on other grounds, 424 F.2d 63 (2d Cir. 1970); SEC v. Van Horn, 371 F.2d 181 (7th Cir. 1966). Finally, Parks' argument that he received no financial benefit from the transactions in question is not meritorious. Assuming *arguendo* that it be true, we have already stated that no financial stake or motivation is necessary to find liability. *See* SEC v. North Am. Research & Dev. Corp., 424 F.2d 63, 81 (2d Cir. 1970).

### D. *John D. Smith*

Appellant contends that (1) the SEC complaint fails to allege a concert of action between appellant and other defendants; (2) he was not a control person; (3) he was not an underwriter and the pledge of stock was not a distribution; and (4) he relied upon a registration statement filed with the SEC.

█ Appellant's first contention is without merit. Count I of the amended complaint lists appellant with the other defendants as having joined in the illegal distribution of unregistered securities. Although Count I does not specifically mention "joint participation," the joint listing of the defendants' names gives sufficient notice of the allegation and, furthermore, the statute itself speaks in terms of joint participation.

Appellant's second contention is correct, as the SEC appears to concede in its brief. Although the trial court did find Smith to be an issuer as a matter of law, it did not, in its findings of fact, conclude that Smith was a member of the control group or that he was a control person. On behalf of MFTD, Smith acquired options on 200,000 shares of ICDC stock; he subsequently exercised one option for 100,000 shares and transferred the other option. Smith did not attend the October 8 stockholders meeting and there is no evidence that he had any influence over ICDC policies or those of the control group. Therefore, there is a lack of evidence establishing that he was an issuer.

█ The trial court's finding that appellant was an underwriter is supported. Appellant and MFTD were joint participants in the scheme to distribute ICDC stock. It is clear that appellant did not purchase from an issuer. However, appellant sold and participated in the distribution of ICDC stock. Appellant testified that he personally purchased 4,000 shares in the fall of 1968 and sold them shortly thereafter. Otherwise, appellant acted on behalf of MFTD. No immunity from liability under the Securities Acts arises from this association. Appellant testified that he negotiated on behalf of MFTD the sale of 30,000 shares. He also testified that he negotiated the sale of 210,000 shares of ICDC to defendant Moran; the shares were to come from those pledged with the banks. As Moran sold the shares and returned some of the proceeds to MFTD, MFTD was to pay its indebtedness and then transfer the released pledged stock to Moran. This agreement was partially completed before the SEC acted to prevent further distribution.

Appellant devotes much of his brief to the contention that the pledges involved were not distributions and, therefore, he is not an underwriter. He neglects entirely the trial court's finding that some of the shares were sold outright. These sales make it unnecessary to consider whether the pledges themselves constituted distributions in violation of Section 5. The sales, aside from the question of pledges, evidence participation in a joint scheme of distribution. As was

stated in Securities and Exchange Commission v. National Bankers Life Ins. Co., 324 F.Supp. 189, 194 (N.D.Tex. 1971):

> Certain acts by persons other than issuers or underwriters are so intertwined with the acts by those persons that they are liable on the basis of aiding and abetting in the violation of Section 5 of the Securities Act of 1933. Under this theory a defendant could be held liable if he was involved in the acquisition of the shares to be sold. Nees v. Securities & Exchange Commission, 414 F.2d 211, 220 (9th Cir. 1969). Further a defendant could be held liable merely for taking "steps necessary to the distribution." Securities & Exchange Commission v. North American R & D Corp., *supra*, 424 F.2d [63] at 81. No intent is required to violate Section 5 as an aider and abettor and the only knowledge requirement is that a defendant "had reason to know or should have known that the securities should have been registered." Nees v. Securities & Exchange Commission, *supra*, 414 F.2d at 220–221.

As to the final statement in this quotation, appellant contends that he reasonably relied upon the fact that a registration statement had been filed by American Duchess and that ICDC had filed a Form 10. He states that he lacked knowledge that the securities distributed should have been registered. Aside from the fact that this point is raised here on appeal for the first time,[2] it cannot seriously be argued, in light of appellant's intimate association with MFTD and the principals involved in this whole operation, that appellant did not have reason to question the status of the securities.

### E. *John Syphers*

Appellant contends that the evidence is insufficient to find that he was either an issuer or underwriter within the meaning of Section 2(11) or that he was a participant in the scheme to distribute unregistered securities.

Although Syphers, like Cardall, acquires no immunity from the fact that he acted on behalf of a corporate entity, the record fails to demonstrate that Syphers was an issuer under Section 2(11). There is a shortage of evidence to support a conclusion that he was a member of the control group. Syphers sold his remaining shares in Interland to defendant Allen in February 1968 for $100. The trial court did find that Syphers assisted the calling of the October 8 stockholders meeting, but the evidence shows only that he made available the Interland shareholder list. This is part of a transfer agent's function. Syphers did not give financial assistance to the reorganizers, although, as we have seen, this is not a necessary factor for control, or aid in any of the stockholder letters. Further, Syphers had no office or directorship in ICI or ICDC and he had no role in the operation or management of the firm.

We also find that it is unnecessary to determine whether Syphers is liable as an underwriter per se, that is, one who buys from an issuer with a view to distribution or sells for an issuer as part of the distribution. Such an approach would put unnecessary emphasis upon the bank pledges with which Syphers was involved. Syphers' culpability is based on the fact that he was a person who, through his intimate relations with the principals involved and his position as transfer agent, was liable for "taking steps necessary to the distribution."

 While Syphers was president of the corporate transfer agent for ICDC, he was also an officer, secretary, of MFTD. As we have seen, MFTD was found to have involved in the joint participation to distribute the securities in

---

**2.** This point was not raised in appellant's answer and was not raised by appellant's attorney in the court below. Further, there is no testimony that appellant relied upon either of the filings or that he inquired as to the state of the registration before selling the stock. In short, there is no evidence that his reliance was reasonable under the circumstances.

question. Moreover, Holman and Pruett, both found to be control persons, were intimately involved in MFTD. The evidence shows that Syphers was not so detached from these contacts so that he could be said to have been free from knowledge of the scheme. Aside from possible liability for the bank pledges themselves, Syphers' role in the distribution scheme is at least illustrated by such pledges. In this light then we must view his actions as transfer agent and thus must conclude that he, with knowledge of the circumstances, was a participant in the illegal distribution. It is not Syphers' role as a transfer agent as such that provides liability; it is this activity together with his other actions, including the sales of stock by MFTD, which makes him responsible as an aider in the distribution.