**UNITED STATES of America, Appellee,**

v.

**Neil T. NAFTALIN, Appellant.**

**No. 77–1290.**

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 30, 1977.

Decided June 13, 1978.

Rehearing and Rehearing En Banc Denied Aug. 4, 1978.

Joe A. Walters (argued and on brief), O'Connor & Hannan, Minneapolis, Minn. (argued), John B. Blatz, III, Minneapolis, Minn. (on brief), for appellant.

Thorwald H. Anderson, Jr., Asst. U. S. Atty., Minneapolis, Minn. (argued), and A. W. Danielson, U. S. Atty., Minneapolis, Minn., on brief, for appellee.

Before BRIGHT, ROSS and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

Neil T. Naftalin, appellant here and defendant in the district court, was indicted on eight counts of employing a scheme to defraud in the offer or sale of securities, in violation of § 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1). Appellant was tried without a jury in the United States District Court for the District of Minnesota and found guilty on all eight counts. He was sentenced to five years imprisonment on

each of the eight counts, to be served concurrently. This court has jurisdiction on appeal under 28 U.S.C. § 1291.

The alleged schemes to defraud consisted of appellant ordering five different brokers in eight separate transactions to sell stock listed on the New York Stock Exchange that appellant did not own at the time of the orders, either without disclosing that he did not own the stock or by affirmatively misrepresenting that he did own the stock. Counts I–V, VII and VIII of the indictment arose out of sell orders placed with various broker-dealers whereby the brokers became appellant's agents for the purpose of finding buyers for the stock and transferring the stock to the third party purchasers. Count VI, presently to be discussed separately, differs from the other counts in that the evidence adduced in support thereof shows that on August 28, 1969, H. S. Kipnis and Co., the brokerage house involved, purchased the securities mentioned in that count as a principal rather than acting as appellant's agent for the sale of the securities to third parties.

Appellant was the president and controlling shareholder of Naftalin and Co., Inc. (Company), a corporation registered as a securities dealer under federal and Minnesota securities laws. Prior to 1963, the Company operated a public business as a broker-dealer. After 1963, and at the time of the transactions involved in this case, the Company had ceased doing business with the public and was operated essentially as a one-man business with appellant conducting all of its affairs.

From 1966 until the time of the transactions involved in this case, appellant had been trading for the Company's account in a number of stocks. The pattern of trading which appellant established during this period, and particularly in the summer of 1969, was to place large sell orders in the Company's name with various broker-dealers for listed stocks. Delivery of the securities for these transactions was often made weeks or months after the settlement dates set forth in the confirmation slips prepared and mailed to the Company by the brokers.[1]

Naftalin was, and is, a knowledgeable and sophisticated professional investor. It is possible that such a person can sell securities that he does not own without at the time disclosing he does not own them or representing falsely that he does own them. If before delivery of the securities is required the market price declines the seller can buy in the securities at a lower price and pocket the difference. Of course, if the market advances the seller suffers loss, and if he does not deliver the securities the broker through whom he sells suffers loss. To be sure, a seller lawfully may sell stock he does not own "short" if he discloses at time of sale that he is short and if he maintains appropriate brokerage accounts and otherwise trades according to prescribed procedures. However, the government charges in essence that undisclosed short sales misrepresented as sales of stock owned by the seller, i. e., "long" with intent to deceive the broker and take a free ride on the broker's money or credit are made unlawful by § 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).[2]

---

1. A good description of Naftalin's over-all "short-selling" or "free-riding" mode of operation during the indictment period may be found in *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 469 F.2d 1166, 1170 (8th Cir. 1972). *See also United States v. Naftalin,* 534 F.2d 770 (8th Cir.), *cert. denied,* 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 89 (1976).

2. Securities Act of 1933, 15 U.S.C. § 77q(a):
    Sec. 17(a). It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in inter-

state commerce or by the use of the mails, directly or indirectly—
    (1) to employ any device, scheme, or artifice to defraud, or
    (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
    (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Appellant never delivered any of the stock which he had agreed to deliver pursuant to the sell orders included in this case. With regard to Counts I–V, VII and VIII, when appellant failed to deliver the stock involved, the brokers ultimately purchased stock sufficient to cover the sales which they had arranged with third party purchasers. With perhaps one exception, the indictment transactions resulted in loss to the brokers. There is no evidence that any of the third party purchasers were deceived or defrauded in any way.

Appellant urges on appeal that the evidence adduced at trial was insufficient as a matter of law to support the district court's finding of fraud. While we are convinced there is no merit to that claim we pretermit further discussion of it and the factual details of the fraudulent acts at this juncture because we are not persuaded that the provision of § 77q(a)(1) under which appellant was put to trial is violated by the species of fraud practiced against the defrauded brokers who were not purchasers, and for that reason we reverse on all counts other than Count VI.[3]

With respect to the counts now under consideration, the government argues that the issue is whether the government alleged and proved a device, scheme or artifice to defraud in the offer or sale of a security. And the government insists that 15 U.S.C. § 77q(a)(1) does not require that the purchaser be defrauded, so long as someone is defrauded in the offer or sale of securities.

■ While we agree with the government's statement of the issue in this case, we do not agree with the government's analysis of the requirements of 15 U.S.C. § 77q(a)(1). It is clear that as between appellant and the brokers, there was no offer or sale of securities. Appellant made phone calls to the various brokers, during which he allegedly made a number of fraudulent statements, but he did not propose to sell any securities to the brokers alleged to have been defrauded. Appellant did request that the brokers find purchasers for appellant's stock and did authorize sales for his account. A stockbroker does not become the purchaser of stock when an owner requests that the broker sell certain of the owner's securities. The ordinary relationship of a stockbroker to his customer is that of principal and agent. *See Galigher v. Jones,* 129 U.S. 193, 9 S.Ct. 335, 32 L.Ed. 658 (1889); *McMann v. Securities and Exchange Commission,* 87 F.2d 377 (2d Cir. 1937). And the facts here clearly indicate that the stockbrokers were acting as agents of appellant, with the limited authority to find persons willing to purchase appellant's stock and subsequently to transfer the stock to the purchasers.

The third party purchasers to whom the brokers sold were not deceived or defrauded in any way. They received the securities from the brokers and paid the price they had contracted to pay.

■ The legislative purpose in enacting 15 U.S.C. § 77q(a)(1) was to protect investors from fraudulent practices in the sale of securities. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Securities and Exchange Commission v. International Chem. Dev. Corp.,* 469 F.2d 20, 26 (10th Cir. 1972); *Superintendent of Ins. of the State of New York v. Bankers Life & Cas. Co.,* 300 F.Supp. 1083, 1094 (S.D.N.Y.), *aff'd,* 430 F.2d 355 (2d Cir. 1970), *rev'd on other grounds,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Dolgow v. Anderson,* 43 F.R.D. 472, 482 (E.D.N.Y. 1968).

As Mr. Justice Powell noted in *Ernst, supra,* 425 U.S. at 194, 96 S.Ct. 1375, federal regulation of transactions in securities emerged as part of the aftermath of the market crash in 1929. In the decade prior to 1933 the investing public suffered losses

---

**3.** Other issues raised on appeal are (1) that the district court had no jurisdiction with regard to Counts I–V because of a lack of proof of use of the mails by appellant; (2) that sentencing on eight counts was improper since the proof showed only a single scheme to defraud; and

(3) that appellant was exposed to double jeopardy due to prior disciplinary action which had been taken by the Securities and Exchange Commission in connection with the same stock transactions.

through investments in worthless securities estimated at twenty-five billion dollars. S.Rep.No. 47, 73rd Cong., 1st Sess., 2, to accompany S. 875 (April 27, 1933). At the time there was national concern with public sales of worthless stock to persons who had no means of adequate protection and emphasis upon protecting the investing public from exploitation through sales of unsound, fraudulent and worthless securities. In a message to the Congress President Franklin D. Roosevelt on March 29, 1933 said in part:

> In spite of many State statutes the public in the past has sustained severe losses through practices neither ethical nor honest on the part of many persons and corporations selling securities.
>
> Of course, the Federal Government cannot and should not take any action which might be construed as approving or guaranteeing that newly issued securities are sound in the sense that their value will be maintained or that the properties which they represent will earn profit.
>
> There is, however, an obligation upon us to insist that every issue of new securities to be sold in interstate commerce shall be accompanied by full publicity and information, and that no essentially important element attending the issue shall be concealed from the buying public.
>
> This proposal adds to the ancient rule of caveat emptor, the further doctrine 'let the seller also beware.' It puts the burden of telling the whole truth on the seller. It should give impetus to honest dealing in securities and thereby bring back public confidence.
>
> The purpose of the legislation I suggest is to protect the public with the least possible interference to honest business.

"Regulation of Security Issues," Message from the President of the United States, March 29, 1933. *House Document* No. 12, 73rd Congress.

▪ It was against this backdrop that the Securities Act of 1933, including the section now codified as 15 U.S.C.

§ 77q(a)(1), was adopted. And it is against this backdrop that we are constrained to hold that the government must prove some impact of the scheme on an investor. *United States v. Ashdown*, 509 F.2d 793, 799 (5th Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975), *quoting United States v. Schaefer*, 299 F.2d 625, 629–30 (7th Cir. 1962).

▪ Our resolve is strengthened by reference to the general principle that statutes creating crimes are to be strictly construed in favor of the accused and before one may be punished it must appear that his case is plainly within the statute. *United States v. Harris*, 544 F.2d 947, 949 (8th Cir. 1976); *United States v. Freeman*, 473 F.2d 7, 9 (8th Cir. 1973); *Jacobs v. United States*, 359 F.2d 960, 964 (8th Cir. 1966).

Moreover, the government has cited and our research has uncovered no case in which 15 U.S.C. § 77q(a)(1) has been used to prosecute a defendant for fraud in the sale of securities perpetrated upon an agent-broker, where no investor has been deceived or defrauded as a result of the fraud. We decline to expand the scope of 15 U.S.C. § 77q(a)(1) to encompass the facts of the present case.

▪ Turning now to Count VI of the indictment, as indicated it may be observed that the evidence shows that on August 28, 1969 Naftalin called H. S. Kipnis & Co. (Kipnis) to sell 1,000 shares of Fairchild Camera (Fairchild). Kipnis, which both bought and sold Fairchild for its own account, executed the order by purchasing the shares.[4]

The evidence is somewhat conflicting as to representations, if any, made by Naftalin in connection with the sale and as to whether Naftalin was in fact "short." There are also facts including the fact of a substantial post sale payment on the Kipnis account by Naftalin in September, 1969 tending perhaps to show lack of fraudulent intent never to deliver stock or pay a debit balance.

---

**4.** We are not advised as to whether Naftalin knew immediately that Kipnis was the purchaser; however, in due course of business he learned the identity of the purchaser to whom he had sold.

On the other hand, there is strong evidence tending to support a finding of guilt.

Nevertheless, the conviction under Count VI must be reviewed precisely as the other counts were reviewed even though a sale to Kipnis was in evidence.

In passing upon pretrial motions the district court ruled that the entire indictment was not subject to dismissal on the ground that it did not charge Naftalin with having defrauded "purchasers," and rejected the government's argument that it could satisfy the purchaser requirement by proving that certain shares were sold to Kipnis.

In rejecting the government's argument, the trial court noted the indictment did not allege that Kipnis was a purchaser and observed that the defendant could not be tried on charges that were not made. Accordingly, the trial court concluded this portion of its reasoning by announcing that the government would be limited at trial to proof of violations of § 17(a)(1). Under the statutory construction applied by the trial court this meant, of course, that proof of the fact of purchase by Kipnis was not to be considered essential at trial. Indeed, as the government concedes with commendable candor, fraud on the purchaser as purchaser was not charged.

Thus we have an anomalous situation in which we have held that the theory and facts upon which the case went to trial do not permit conviction, but in which we perhaps could sustain a conviction had the defendant been put to trial upon another basis.

In the circumstances, we must vacate the conviction on Count VI also.

The judgments of conviction are vacated and the indictment shall be dismissed.

ROSS, Circuit Judge, concurring and dissenting.

I concur in the disposition of all of the counts except Count VI. I would affirm the conviction as to Count VI.